# Attachment A

Avery S. Mehlman (ID: 251072017)
Maxim M.L. Nowak (ID: 019892012)
Joshua J. Schoch (admitted *pro hac vice*)
**HERRICK, FEINSTEIN LLP**
Two Park Avenue
New York, New York 10016
(212) 592-1400
AMehlman@herrick.com
MNowak@herrick.com
JSchoch@herrick.com
*Attorneys for Plaintiff*
*BMF Advance, LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

– – – – – – – – – – – – – – – – – – – – – – – – –X

BMF ADVANCE LLC,                              :

                                   **AMENDED COMPLAINT**

                         Plaintiff,                    :

                            v.                        :

EMPIREMEDIHOLDINGS, LLC, RETRO            :   Civil Action No: 3:34-cv-00803
CAPITAL, LLC, A NEW HORIZON LLC,
BALBOA HORIZONS RECOVERY SERVICES         :
INC., COMMISSIONS EARLY LLC,              :
RESURGENCE TENNESSEE LLC, ARON
HACOEN, DAVID DWEK, DOVID LAX,               (JURY TRIAL DEMANDED)
MARC CHEMTOB, MAYER CHEMTOB, and
STEPHEN J. FENNELLY,

                      Defendants.             :

– – – – – – – – – – – – – – – – – – – – – – – – –X

Plaintiff BMF Advance LLC, located at 1820 Avenue M, Suite 125, Brooklyn, NY 11230

("Plaintiff" or "BMF"), through its attorneys Herrick, Feinstein LLP, as and for its Complaint

against defendants, EmpireMediHoldings, LLC, Retro Capital, LLC ("Retro"), A New Horizon

LLC ("New Horizon" and with Retro, collectively the "Retro Defendants"), Balboa Horizons

Recovery Services Inc., Commissions Early LLC, Resurgence Tennessee LLC,[1] Aron Hacoen, David Dwek, Dovid Lax, Marc Chemtob, Mayer Chemtob, and Steven J. Fennelly ("Fennelly") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.       This is an action for Tortious Interference with Contract, Fraud and Civil Conspiracy to Commit Fraud.  Defendants, a confederation of a chain of substance abuse and rehabilitation centers, their owners and a group of sophisticated distressed asset financiers, illegally conspired to defraud Plaintiff, a merchant cash advance company, of millions of dollars.

2.       Pursuant to a written contract entered on or about October 6, 2021, in exchange for a payment of $4,100,000, Plaintiff purchased $5,658,000 of receivables from several substance abuse and rehabilitation centers, the Resurgence Entities, that were controlled at the time by Fennelly.  To avoid paying Plaintiff the millions of dollars owed to it, the Retro Defendants, their owners and affiliates engaged in a scheme — which has included potentially false material misrepresentations to a court — designed to prevent Plaintiff from collecting the monies it is unquestionably and legally owed.  Accordingly, Plaintiff seeks the full outstanding balance owed to it by the Resurgence Entities, in addition to punitive damages, costs, interest and attorneys' fees and any other appropriate relief.

## PARTIES

---

[1] Resurgence California LLC d/b/a Resurgence California, Balboa Horizons Recovery Services Inc., Commissions Early LLC, A New Start Treatment and Recovery Center LLC d/b/a Muse Treatment, Resurgence Behavioral Health LLC and Resurgence Tennessee LLC are collectively known as the "Resurgence Entities."

3.      Plaintiff, BMF Advance LLC, is a limited liability company formed under the laws of the State of New York with a mailing address of 1820 Avenue M, Suite 125, Brooklyn, NY 11230.

4.      Upon information and belief, Defendant EmpireMediHoldings LLC ("EmpireMedi" or "EmpireMediHoldings") is a limited liability company formed under the laws of the State of New York with a mailing address of 10 Treeside Lane, Lakewood, New Jersey 08701 and organized by Steven Weiss.

5.      Upon information and belief, Defendant Retro Capital, LLC d/b/a Saturn Encore Funding is a limited liability company formed under the laws of the State of Delaware with a mailing address of 45 Goldcrest Drive, Lakewood, New Jersey 08701 and organized by Steven Weiss.

6.      Upon information and belief, Defendant A New Horizon LLC ("New Horizon") is a limited liability company formed under the laws of the State of Delaware with a mailing address of 1209 Orange Street, Wilmington, Delaware 19801.

7.      Upon information and belief, Defendant Balboa Horizons Recovery Services Inc. ("Balboa") is a corporation formed under the laws of the State of California with a mailing address of 1976 Derby Drive, Santa Ana, California 92705.

8.      Upon information and belief, Defendant Commissions Early LLC ("Commissions Early") is a limited liability company formed under the laws of the State of Nevada with a mailing address of 3064 Silver Sage Drive, Suite 150, Carson City, Nevada 89701.

9.      Upon information and belief, Defendant Resurgence Tennessee LLC ("Resurgence Tennessee") is a limited liability company formed under the laws of the State of Tennessee with a mailing address of 201 William D. Jones Blvd., Fayetteville, Tennessee 37334.

10.     Upon information and belief, Defendant David Dwek ("Dwek") is an individual who resides at 45 Goldcrest Drive, Lakewood, New Jersey 08701.

11.     Upon information and belief, Defendant Dovid G. Lax ("Lax") is an individual who resides at 124 Stratford Place, Lakewood, New Jersey 08701.

12.     Upon information and belief, Defendant Marc M. Chemtob ("Marc Chemtob") is an individual who resides at 250 Hollywood Avenue, Long Branch, New Jersey 07740.

13.     Upon information and belief, Defendant Mayer M. Chemtob ("Mayer Chemtob") is an individual who resides at 162 Daniel Drive, Lakewood, New Jersey 08701.

14.     Upon information and belief, Defendant Aron Hacoen ("Hacoen") is an individual who resides at 10 Treeside Lane, Lakewood, New Jersey 08701.

15.     Upon information and belief, Defendant Stephen J. Fennelly is an individual who currently resides at 646 Dorado Beach Cottages, Dorado, Puerto Rico 00646.

## JURISDICTION

16.     Plaintiff's sole member, Gavriel Yitzchakov (a.k.a. Gabe Isaacov), is a resident of the State of Florida.

17.     Upon information and belief, Retro has four members: Dwek, Lax, Mayer Chemtob and Marc Chemtob, each of whom is a resident of the State of New Jersey (collectively, the "Retro Members").

4

18.     Upon information and belief, the members of New Horizon are residents of the State of New Jersey.

19.     Upon information and belief, Hacoen, a resident of New Jersey, is the only publicly identified member of EmpireMedi.

20.     Upon information and belief, the Resurgence Entities are residents in the states of Tennessee, California and Nevada.

21.     Fennelly is currently a resident of the Commonwealth of Puerto Rico.

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is a dispute between citizens of different states.

23.     Specifically, upon information and belief, between April and November 2021, Fennelly, both directly and through his agents, engaged in extensive negotiations with Retro and the Retro Members while they were physically present in this District.  During these negotiations, the Defendants concocted and agreed to carry-out the scheme that is the subject of this complaint.

## VENUE

24.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the activities alleged in this complaint took place in this District.

25.     Alternatively, venue is appropriate pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS

26.     Plaintiff is engaged in the receivable financing business.

27.     Shortly before October 6, 2021, Fennelly, as the owner of the Resurgence Entities, approached Plaintiff about entering into a merchant cash advance agreement.

28.     On or about October 6, 2021, the Resurgence Entities, with Fennelly as a guarantor, entered into a Secured Purchase Agreement (the "MCA Agreement") pursuant to which Plaintiff purchased 15% (the "Specified Percentage") of the Resurgence Entities' total future accounts receivable up to the sum of $5,658,000 (the "Purchased Amount") in exchange for an immediate payment of $4,100,000.  The parties to the MCA Agreement negotiated and agreed to the terms of the MCA Agreement in good faith and at arm's length.

29.     Pursuant to the MCA Agreement, every business day, the Resurgent Entities agreed to remit 15% of their daily receipts (the "Daily Remittance") via ACH payment.  Based on a review of the documents provided to Plaintiff by Resurgence Entities, the parties agreed in good faith that the initial Daily Remittance would be approximately $34,999 per business day, subject to the Resurgence Entities right to request a reconciliation should their receipts change.  A true and correct copy of the MCA Agreement is annexed hereto as **EXHIBIT A**.

30.     Pursuant to the MCA Agreement, Plaintiff was authorized to collect the Daily Remittance via ACH electronic debit (the "ACH Authorization") until such time as the Plaintiff had collected the entirety of the $5,658,000 Purchased Amount.

31.     To facilitate the Daily Remittance, the MCA Agreement contains covenants by the Resurgence Entities that they will not revoke the ACH Authorization or otherwise take any steps to interfere with Plaintiff's ability to collect the Daily Remittance.

32.     In connection with the execution of the MCA Agreement, Fennelly explicitly represented to Plaintiff that the Resurgence Entities would fully perform their obligations under the MCA Agreement.

33.     Pursuant to the ACH Authorization, the Plaintiff made nine debits of the Daily Remittance toward the Purchased Amount.

34.     Contrary to the covenants and representations discussed above, on or about October 20, 2021, the Resurgence Entities materially breached the MCA Agreement by blocking Plaintiff's ACH authorization to debit the Daily Remittance.

35.     Since October 20, 2021, the Resurgence Entities have failed to make any further remittances to Plaintiff, leaving a balance of $5,343,009 towards the Purchased Amount (the "Outstanding Balance").

36.     On or about August 26, 2022, in connection with another lawsuit, Fennelly signed a 43-paragraph affidavit (the "Fennelly Affidavit").   A true and correct copy of the Fennelly Affidavit is attached hereto as **EXHIBIT B**.  The Fennelly Affidavit serves as the factual basis for many of the allegations in this Complaint.

37.     As sworn to in the Fennelly Affidavit, beginning in or around October 2020 and through 2021, the Resurgence Entities and Fennelly entered into at least seven (7) other merchant cash advance agreements that provided the Resurgence Entities with additional liquidity.   In connection with these agreements, Fennelly guaranteed the obligations of the Resurgence Entities, just as he did with the MCA Agreement.

38.     One of the earlier merchant cash advance companies with whom Fennelly dealt was Iruka Capital Group LLC ("Iruka").

39.     In connection with its merchant cash advance (the "Iruka MCA Agreement"), Iruka allegedly perfected its security interest in certain assets of Balboa, Commissions Early, and various

non-defendant entities owned by Fennelly[2] by filing a UCC-1 Financing Statement (the "Iruka UCC-1") with the California Secretary of State.

40.      As sworn to in the Fennelly Affidavit, but at the time unbeknownst to Plaintiff, in or around April 2021, Fennelly began exploring the sale of the Resurgence Entities.

41.      As sworn to in the Fennelly Affidavit, sometime in or around April 2021, Fennelly was introduced to Dwek and Lax as potential purchasers of the Resurgence Entities.

42.      After Fennelly's initial discussions with Dwek and Lax, Fennelly instructed Nathan Fransen, Esq. ("Fransen"), counsel for the Resurgence Entities, to contact Retro and the Retro Members to discuss the terms of a potential sale of the Resurgence Entitles to Retro, a distressed asset financing company.

43.      As sworn to in the Fennelly Affidavit, the Retro Members are all family members. Mark Chemtob is Mayer Chemtob's father, Dwek's father-in-law, and Lax's uncle.

44.      As sworn to in the Fennelly Affidavit, Fransen and the Retro Members discussed, among other things, the debts owed to various merchant cash advance companies and potential strategies to increase the Resurgence Entities' cash while stymying any efforts of merchant cash advance creditors to collect on their contracts by structuring a transaction to allow Retro, as the new owner of the Resurgence Entities, to avoid paying the merchant cash advance companies.

---

[2] The Iruka UCC-1 also was filed against Resurgence California LLC d/b/a Resurgence California, A New Start Treatment and Recovery Center LLC d/b/a Muse Treatment; A Plus C Quality Construction LLC ("A Plus C"); Advanced Recovery Solutions, LLC ("ARS"), Better Soul Inc. ("Better Soul"); Coastal Recovery, Inc. ("Coastal Recovery"); Coastal Recovery Health & Wellness, Inc. ("Coastal Health"); Pearl of the Sea Retreat, LLC's ("Pearl"); and The Well Recovery Partners, Inc. ("Well Recovery Partners").

45.     As sworn to in the Fennelly Affidavit, the Retro Members explained to Fransen and Fennelly that they would create a new entity to become the owner of the Iruka MCA Agreement and successor in interest of the Iruka UCC-1 through purchase and/or assignment.  The Retro Members believed owning the Iruka MCA Agreement and the Iruka UCC-1 through an entity they could control, would allow the Retro Members to simultaneously cease enforcing the Iruka MCA Agreement and the Iruka UCC-1 and prevent any junior secured creditors of the Resurgence Entities, like Plaintiff, from enforcing claims to any of the Resurgence Entities' future receivables while at the same time allowing the Retro Members to operate the Resurgence Entities as a going concern.  The Retro Members planned to abuse their position as the new senior secured lender to allow the Resurgence Entities to operate without servicing their junior secured obligations.

46.     Approximately two days before the MCA Agreement was consummated between the Resurgence Entities and Plaintiff, Retro sent Fennelly a formal letter of intent, dated October 4, 2021, offering to purchase the Resurgence Entities and other related entities owned by Fennelly for $22.3 million (the "Retro LOI").  A copy of the Retro LOI is attached hereto as **EXHIBIT C**.

47.     As sworn to in the Fennelly Affidavit, in case the Retro Defendants were not able to avoid paying the merchant cash advance companies through the purchase of the Iruka MCA Agreement and the Iruka UCC-1, Retro structured its offer such that $7 million (the "Retro Settlement Reserve") of the proposed purchase price would be held in reserve to settle – for reduced amounts – with the merchant cash advance companies to which the Resurgence Entities were obligated.  Any amount of the Retro Settlement Reserve remaining after the merchant cash advance obligations were settled would revert to Fennelly.

48.     Knowing that he had already negotiated a sale of the Resurgence Entities to Retro, and at least being knowledgeable of the scheme concocted by the Retro Defendants to block the payment of junior secured merchant cash advance companies, Fennelly and the Resurgence Entities nevertheless entered into the MCA Agreement with Plaintiff.

49.     As sworn to in the Fennelly Affidavit, on or around November 4, 2021, the Retro Members formed EmpireMedi to purchase the Iruka MCA Agreement and to take an assignment of the Iruka UCC-1.

50.     As sworn to in the Fennelly Affidavit, the Retro Members advised Fransen, as agent for the Resurgence Entities and Fennelly, of their strategy to create a new affiliated entity, EmpireMedi, for the specific and sole purpose of taking an assignment of the Iruka MCA Agreement and, most importantly, the Iruka UCC-1.

51.     Upon information and belief, the newly created affiliated entity, EmpireMedi, with a principal mailing address of 10 Treeside Lane, Lakewood, New Jersey 08701, was organized on or about November 4, 2021 by a non-party individual named Steven Weiss.

52.     Upon information and belief, 10 Treeside Lane, Lakewood, New Jersey 08701 is owned by Hacoen, a confederate of the Retro Members.

53.     Upon information and belief, when the Retro Members and Retro Defendants analyzed purchasing the Resurgence entities, it was contemplated that Hacoen would be a key member of the new operating team.

54.     Accordingly, upon information and belief, EmpireMedi, Retro Capital, and New Horizon are effectively under the direct or indirect control of the Retro Members.

55.     As sworn to in the Fennelly Affidavit, on or around November 5, 2021, Iruka assigned EmpireMedi the Iruka MCA Agreement and the Iruka UCC-1.

56.     Upon information and belief, New Horizon, an affiliate of Retro, was formed in November 2021 for the sole purpose of consummating the purchase of Fennelly's Resurgence Entities by the Retro Members.

57.     As sworn to in the Fennelly Affidavit, on or about November 30, 2021, Fennelly and the Retro Defendants closed the transaction contemplated by the October 4, 2021, Retro LOI. This Equity Interest Purchase Agreement By and Among A New Horizon, LLC, Stephen J. Fennelly, and Resurgence Behavioral Health, LLC substituted New Horizon for Retro as the purchaser of the Resurgence Entities.  Accordingly, on and after November 30, 2021, there was common ownership and/or control between EmpireMedi, the purported secured party enforcing its rights, and the Resurgence Entities against which EmpireMedi is claiming to be enforcing its rights.

58.     On or about November 15, 2021, EmpireMedi, through counsel Ashlee Colonna Cohen ("Colonna Cohen"), filed suit in New York State Supreme Court, New York County (the "EmpireMedi Suit") attempting to block Plaintiff from collecting the amounts owed to it by the Resurgence Enmities.

59.     The EmpireMedi suit alleges, *inter alia*, that BMF Advance and other merchant cash advance companies' collection efforts converted accounts receivable belonging to the Resurgence Entities upon which EmpireMedi, by taking an assignment of the Iruka UCC-1, now claimed a first priority security interest.

11

60.     Upon information and belief, EmpireMedi made this misrepresentation to the court even though EmpireMedi did not even have a perfected security interest, much less a priority security interest, in two of the Resurgence Entities, Resurgence California LLC and Commissions Early LLC.

61.     On November 19, 2021, based upon EmpireMedi's express representations that it maintained a first priority security interest in the accounts receivable of the Resurgence Entities *that it was enforcing,* the court in the EmpireMedi Suit issued an *ex parte* temporary restraining order (the "TRO") that, in essence, prohibited Plaintiff from attempting to pursue the Resurgence Entities' receivables as set forth in the MCA Agreement.

62.     On or about August 26, 2022, in connection with the EmpireMedi Suit, Fennelly signed the Fennelly Affidavit.  The purpose of the Fennelly Affidavit was to explain Fennelly's sale of the Resurgence Entities to the Retro Members.

63.     In paragraph 15 of the Fennelly Affidavit, Fennelly swears that it was the Retro Members' "strategy [to] form[] a new entity, EmpireMediHoldings, LLC [] for the specific purpose of taking an assignment of the Iruka MCA and the associated UCC-1 Financing Statement" so that EmpireMedi "would become the owner of the first-priority UCC-1 Financing Statement and would be able to file a lawsuit to prevent any junior secured creditors from enforcing their security interests against the Merchants and [Fennelly]."

64.     In paragraph 25 of the Fennelly Affidavit, Fennelly further swears that after November 5, 2021, "EmpireMediHoldings immediately ceased any and all collection efforts against the Merchants and released the hold created by the Iruka UCC Lien Notice" and "there

have been no further actions by EmpireMediHoldings to enforce the Merchants' obligations under the Iruka MCA."[3]

65.    As sworn to in the Fennelly Affidavit, EmpireMedi has taken no steps to collect any of the amounts due under the Iruka MCA Agreement and the Iruka UCC-1 and does not intend to ever do so because it is a mere ruse to shield the Resurgence Entities from their other creditors and allow them to continue to operate and utilize the accounts receivables that were purchased by Plaintiff and other merchant cash advance companies.

66.    As sworn to in the Fennelly Affidavit, EmpireMedi has not, and does not intend to, enforce its rights against the Resurgence Entities because EmpireMedi and the Resurgence Entities are directly or indirectly owned and/or controlled by the same entities or individuals.

67.    After the Resurgence Entities defaulted on their obligations under the MCA Agreement in 2021, Plaintiff attempted to collect the amounts owed to it.  On December 9, 2021, Plaintiff commenced a breach of contract action against the Resurgence Entities in New York State Supreme Court, Kings County (the "BMF Advance Lawsuit").

68.    On or about March 7, 2022, Colonna Cohen filed an answer on behalf of the Resurgence Entities in the BMF Advance Lawsuit.

69.    Colonna Cohen continues to represent both EmpireMedi in the EmpireMedi Suit and the Resurgence Entities in the BMF Advance Lawsuit. Accordingly, in addition to common

---

[3] On or about October 24, 2022, Colonna Cohen filed a seven-paragraph affidavit in the EmpireMedi Suit purportedly signed by Fennelly on September 22, 2022 (the "Second Affidavit"). The purpose of the Second Affidavit appears to be to discuss the origins of the Fennelly Affidavit and address Fennelly's relationship with Colonna Cohen.  Nowhere in the Second Affidavit does Fennelly purport to withdraw or alter any of the statements to which he swore under the penalties of perjury that are quoted in paragraphs 64 and 65 of this Complaint.  A true and correct copy of the Second Affidavit is attached hereto as **EXHIBIT D**.

ownership and/or control between EmpireMedi and the Resurgence Entities, they are also represented by the same counsel.

70.     On July 6, 2022, in further reliance on the representations by EmpireMedi that it was enforcing its rights against the Resurgence Entities, the court extended the TRO indefinitely, without requiring EmpireMedi to post an undertaking.  As sworn to in the Fennelly Affidavit, the injunction was exactly what the Retro Defendants and their confederates envisioned when they began negotiating the Retro LOI in or around April 2021.

71.     Based upon documents filed by EmpireMedi in the EmpireMedi Suit, the amount outstanding on the Iruka obligation was only $331,460 and the Resurgence Entities generate over $100,000 of receivables each business day such that the Iruka obligation purchased by EmpireMedi would have been paid off in less than a week if EmpireMedi was actually enforcing its rights.  Notwithstanding the foregoing, in pleadings filed by EmpireMedi on or about November 7, 2022, almost one year after the issuance of the TRO, EmpireMedi represented to the court that it had been enforcing its rights against the Resurgence Entities but that the Iruka obligation purchased by EmpireMedi was still outstanding.

72.     In or around June 2023, BMF became aware of a certified transcript of a conversation involving defendant Hacoen, which was dated June 15, 2023 (the "Hacoen Transcript").  A party to the EmpireMedi Suit (who is not part of this litigation) obtained the recording and transcript of the conversation from a non-party to the EmpireMedi Suit, who was part of the recorded conversation.  A true and correct copy of the transcript was filed in the

14

EmpireMedi Suit and a true and correct copy of the Hacoen Transcript is attached hereto as

**EXHIBIT E**.

73.     On page five of the transcript, at lines 8 through 13, Hacoen is transcribed saying

the following:

> It's not ours, that's why I'm saying... there was a specific need that one of the
> one of the ***five partners*** have to have you know their name ***someone had to own
> this LLC they put my name on it,*** I was okay with it to own the senior debt and []
> ***I am not involved at all.*** ... like I said I didn't know if there was more I know like
> I got a list at some point but you know how much is owed ***but I have no idea
> who's who you know who is owned what.*** (emphasis added)

74.     Upon information and belief, BMF believes that Hacoen's reference to "five

partners" in the above excerpt refers to Dwek, Lax, Marc Chemtob, Mayer Chemtob, and

Fennelly, who worked in combination with Hacoen.

75.     BMF believes that the above excerpt indicates that the defendants agreed to work

in concert to cause Hacoen to run EmpireMedi as a figurehead, despite that Hacoen is not

involved with EmpireMedi's day-to-day operations at all and does not know which MCA

companies are allegedly junior creditors to the Iruka UCC-1.

76.     BMF believes that the above excerpt indicates that the defendants agreed to work

in concert to cause EmpireMedi to acquire the Iruka UCC-1 in order to prevent any other

creditors from collecting obligations owed to them by the Resurgence Entities, as detailed in the

Fennelly Affidavit.

15

77.     On page five of the transcript, at lines 15 through 21, Hacoen is transcribed saying the following:

> And I, like I said, I have no problem calling the guy and telling the guy was doing the negotiation on the phone? Guy who's dealing with an attorney and saying listen, there's like there's another he and you know maybe you want to talk to the guy directly like. But at the end of the like we can find out about it and and discuss it and try to help as much as we can ***like our knowledge of the deal, A, is mine is yours is way more limited than mine and mine is still too limited in the MCA world*** to understand like whether the guy is being screwed or the guy is actually being, getting, giving, giving a good. (emphasis added)

78.     BMF believes that the above excerpt further indicates that the defendants agreed to work in concert to cause Hacoen to run EmpireMedi as a figurehead, despite his inexperience and lack of knowledge regarding MCA business.

79.     At no time prior to November 2021 did Fennelly or any of the Retro Defendants inform Plaintiff of the scheme described herein.  Upon information and belief, that scheme was devised by Fennelly and the Retro Defendants and agreements were made between and among the Defendants to facilitate the sale of the Resurgence Entities for the purpose of preventing merchant cash advance companies that funded and perfected their security interests after Iruka, which came to include Plaintiff after the scheme was devised, from collecting the Balances owed to them, including the Outstanding Balance owed to Plaintiff under the MCA Agreement.

## COUNT ONE
### (Tortious Interference with Contract Against EmpireMedi, Hacoen, the Retro Defendants and Retro Members)

80.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs of the Complaint as though set forth fully herein.

81.     The MCA Agreement was a valid and binding contract when it was entered into on October 6, 2021, and Plaintiff took all steps necessary to complete its obligations under the MCA Agreement, including the payment of $4.1 million to the Resurgence Entities.

82.     Upon information and belief, before November 4, 2021, Fennelly informed the Retro Members that the Resurgence Entities had a valid and binding agreement with Plaintiff that required the Resurgence Entities to remit the Outstanding Balance to Plaintiff.

83.     As sworn to in the Fennelly Affidavit, the Retro Defendants formed EmpireMedi and orchestrated the purchase of the Iruka MCA Agreement contract and the Iruka UCC-1 with the express intention and purpose of interfering with the Resurgence Entities' merchant cash advance contracts, and specifically with Plaintiff's ability to collect the amount due to Plaintiff under the MCA Agreement.

84.     The Resurgence Entities have not paid any amounts due under the MCA Agreement since October 20, 2021, and in fact, breached the MCA Agreement after only a few days.

85.     Upon information and belief, as the purchaser of the Resurgence Entities, New Horizon is liable for the debts owed by Resurgence Entities to Plaintiff under the MCA Agreement but has not made any payments of the amounts due under the MCA Agreement.

86.     Using EmpireMedi, the Retro Defendants have enjoined Plaintiff from collecting any of the amounts due to it under the MCA Agreement.

87.     As a direct and proximate result of the Retro Defendants' deliberate interference with the MCA Agreement through EmpireMedi's purchase of the Iruka MCA Agreement and the Iruka UCC-1, Plaintiff has suffered damages in an amount to be proven along with interest, costs and fees.

17

88.     As the result of the Retro Members and Retro Defendants' intentional bad faith interference with the MCA Agreement, Plaintiff should be awarded punitive damages in an amount to be determined at trial.

## COUNT TWO
### (Fraud as Against Fennelly)

89.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs of the Complaint as though set forth fully herein.

90.     Defendant Fennelly willfully, intentionally, maliciously and knowingly deceived and defrauded Plaintiff.

91.     With full knowledge of the falsity of his representations when made, Fennelly represented to Plaintiff that the Resurgence Entities intended to pay the Purchased Amount daily until it was paid in full, pursuant to the schedule contemplated in the MCA Agreement.

92.     The Resurgence Entities' representation that they intended to pay was material and induced Plaintiff into entering into the MCA Agreement.

93.     With full knowledge of the falsity of his representations when made, Fennelly also represented that he was the owner of the Resurgence Entities, thereby making his personal guaranty of the MCA Agreement a valuable consideration for Plaintiff to enter into the MCA Agreement.

94.     Fennelly's representation that he was the owner of the Resurgence Entities was material and induced Plaintiff into entering into the MCA Agreement.

95.     Fennelly also failed to tell Plaintiff that he and the Resurgence Entities had already entered into a scheme with the Retro Defendants to sell the Resurgence Entities and that

18

neither he nor the Resurgence Entities ever intended to honor their respective obligations under the MCA Agreement but rather intended to use a portion of the Retro Settlement Reserve to settle the MCA Agreement for less than the total amount due thereunder and to use the Iruka UCC-1 as a pretense for indefinitely preventing Plaintiff from enforcing its rights under the MCA Agreement.

96.     Fennelly's omission was material as Plaintiff would never have agreed to the MCA Agreement had it known the true facts.

97.     Upon information and belief, Fennelly knew that his misrepresentations and omissions were material when made and he made them with the intention of misleading Plaintiff into sending $4.1 million in cash to the Resurgent Entities, for which Plaintiff would never be fully compensated.

98.     Fennelly intended for Plaintiff to rely upon these misrepresentations and omissions as a means by which to fraudulently induce Plaintiff to enter into the MCA Agreement.

99.     Plaintiff reasonably relied upon Fennelly's misrepresentations and omissions, and, as a result, provided Fennelly's companies with millions of dollars.

100.    Absent Fennelly's material misrepresentations and omissions, Plaintiff would have never entered into the MCA Agreement and paid the Resurgence Entities millions of dollars.

101.    As a direct and proximate result of Fennelly's fraudulent inducement, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than $5,343,009, along with interest, costs and fees.

102.    As the result of Fennelly's fraudulent inducement, Plaintiff should be awarded punitive damages in an amount to be determined at trial.

## COUNT THREE
### (Civil Conspiracy to Commit Fraud as Against All Defendants)

103.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs of the Complaint as though set forth fully herein.

104.    Each of the Defendants entered into a series of agreements with each other, acted in concert with one another and aided and abetted each other to fraudulently induce Plaintiff into entering into the MCA Agreement and paying $4.1 million to the Resurgence Entities knowing that they had devised a plan to avoid paying the amounts owed by the Resurgence Entities under the MCA Agreement.

105.    Defendants, by reason and virtue of the conduct alleged herein, wrongfully and unlawfully acted in concert to obtain $4.1 million from Plaintiff for the Resurgence Entities prior to their purchase by the Retro Defendants from Fennelly, all the while hatching and implementing a scheme to make it impossible for Plaintiff to collect the money due to it under the MCA Agreement.

106.    The Retro Defendants, Retro Members and Fennelly agreed amongst themselves to fraudulently induce Plaintiff to enter into the MCA Agreement with the Resurgence Entities knowing that: (a) the Resurgence Entities had no intention of honoring the terms of the MCA Agreement because Fennelly had agreed to sell the Resurgence Entities to Retro who would then use the Retro Settlement Reserve to attempt to avoid paying the full Outstanding Balance to Plaintiff; and (b) that Retro would acquire the Iruka MCA Agreement and the Iruka UCC-1 for the

20

sole purpose of improperly precluding Plaintiff from collecting the Outstanding Balance, while failing to enforce the terms of the Iruka MCA Agreement against the Resurgence Entities.

107.    Fennelly fraudulently misrepresented the intentions of the Resurgence Entities at the behest and for the benefit of the Retro Defendants, who, as the purchasers of the Resurgence Entities, would directly and materially benefit from the scheme to prevent Plaintiff from collecting the amount due under the MCA Agreement.  This misrepresentation was material because it induced Plaintiff into entering into the MCA Agreement.

108.    To complete the scheme, the Retro Defendants enlisted the help of Hacoen and EmpireMedi to frustrate the Plaintiff's collections efforts.

109.    Plaintiff reasonably relied upon Fennelly's misrepresentation and omissions made after Fennelly had consulted with the Retro Defendants and knew their plans for the Resurgence Entities.

110.    As a direct and proximate result of Fennelly and the Retro Defendants' conspiracy to defraud, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than $5,343,009, along with interest, costs and fees.

111.    As the result of this conspiracy, Plaintiff should be awarded punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor as follows:

A.    On the First Claim against the Retro Members and Retro Defendants, jointly and severally, an amount to be proven at trial along with interest, costs and fees as well as punitive damages to be determined at trial;

B.      On the Second Claim against Fennelly, an amount to be proven at trial along with interest, costs and fees as well as punitive damages to be determined at trial;

C.      On the Third Claim against all Defendants, jointly and severally, an amount to be proven at trial along with interest, costs and fees as well as punitive damages to be determined at trial;

D.      Pre- and post- judgment interest; and

E.      Such other relief as the Court deems just and proper.

Dated: August 4, 2023
New York, New York

By: /s Avery S. Mehlman
Avery S. Mehlman (ID: 251072017)
Maxim M.L. Nowak (ID: 019892012)
Joshua J. Schoch (admitted *pro hac vice*)
**HERRICK, FEINSTEIN LLP**
Two Park Avenue
New York, New York 10016
(212) 592-1400
AMehlman@herrick.com
MNowak@herrick.com
JSchoch@herrick.com
*Attorneys for Plaintiff, BMF Advance LLC*

# EXHIBIT A

Case 1:23-cv-00803-ZNQ-JBD Document 35-1 Filed 08/04/23 Page 25 of 115 PageID: 383



## BMF Advance, LLC

### Secured Purchase Agreement

**Agreement dated** ___10/06/2021___ **between BMF Advance, LLC ("BMF"), having a place of business in Connecticut, and the merchant listed below ("MERCHANT").**

<u>**Merchant Information**</u>

**Merchant's Legal Name:** RESURGENCE CALIFORNIA LLC, AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** RESURGENCE CALIFORNIA

**Physical Address:** 3151 AIRWAY AVE STE E1

**City:** COSTA MESA          **State:** CA          **Zip:** 92626          **Business Phone:**

**Mailing Address:** 3151 AIRWAY AVE STE E1          **City:** COSTA MESA          **State:** CA          **Zip:** 92626

**Type of Entity (check one):** ☐ Corporation  ☑ Limited Liability Company  ☐ Limited Liability Partnership  ☐ Limited Partnership  ☐ Sole Proprietor

**State of Incorporation or Organization:** _____

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to BMF (making BMF the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other thirdparty payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to BMF.

Merchant is selling a portion of a future revenue stream to BMF at a discount, not borrowing money from BMF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BMF. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BMF is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BMF assumes these risks based on Merchant's representations, warranties and covenantsin this Agreement, which are designed to give BMF a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

BMF will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, BMF (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as BMF receives payment in full of the Purchased Amount. Merchant hereby authorizes BMF to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. BMF's payment of the Purchase Price shall be deemed the acceptance and performance by BMF of this Agreement. Merchant understands that it is responsible for ensuring that the Agreed Remittance to be collected by BMF remains in the Account and will be held responsible for any fees incurred by BMF resulting from a rejected ACH attempt or an Event of Default. BMF is not responsible for any overdrafts or rejected transactions that may result from BMF's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between BMF and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**Purchased Percentage:** 15          **Purchase Amount:** $ 5,658,000.00

**Purchase Price:** $ 4,100,000.00

**Remittance:** $ 34,999.00          **Payment Frequency:** Daily

---

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A P_____ _____REEME___**

FOR THE MERCHANT (#1) By: STEPHEN JAMES FENNELLY          OWNER
(Print Name and Title)

*DocuSigned by:*
*Stephen Fennelly*
731BB0 36470423...
**(Signature)**          Initials  **SF**

FOR THE MERCHANT (#2) By:_____
(Print Name and Title)          Initials ___

*DocuSigned by:*
*Stephen Fennelly*
731BB0 36470423...
**(Signature)**          Initials  **SF**

BY OWNER (#1) By: STEPHEN JAMES FENNELLY          OWNER
(Print Name and Title)          Initials ___

BY OWNER (#2) By:_____
(Print Name and Title)          _____  **Initials**
**(Signature)**

---

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAYCONSTITUTE A SEPARATE CAUSEOF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### 1. TERMS OF ENROLLMENT IN PROGRAM

**1.1** **Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to BMF with a Bank acceptable to BMF to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to BMF with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide BMF and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes BMF and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to BMF for the receipts as specified herein and to pay such amounts to BMF. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by BMF or not. This additional authorization is not a waiver of BMF's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which BMF did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of BMF.

**1.2** **Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by BMF as per the terms of this Agreement  The parties hereto agree that this Agreement shall be considered to be formed and perform in Connecticut in all material respects.

**1.3** **Future Purchase of Increments.** Subject to the terms of this Agreement, BMF offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. BMF reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4** **Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BMF to request a decrease in the Remittance. The amount shall be decreased if the amount received by BMF was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BMF with viewing access to their bank account as well as all information reasonably requested by BMF to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5** **Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize BMF and its agents to investigate their financial responsibility and history, and will provide to BMF any authorizations, bank or financial statements, tax returns, etc., as BMF deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. BMF is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6** **Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide BMF with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide BMF with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from BMF.

**1.7** **Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by BMF for monies owed to BMF from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by BMF.

**1.8** **No Liability.** In no event will BMF be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of BMF's attorney's fees and expenses resulting therefrom.

**1.9** **Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, BMF, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10** **Sale of Receipts.** Merchant and BMF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BMF to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. BMF has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to BMF in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that BMF has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and BMF shall promptly refund to Merchant any interest received by BMF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that BMF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11** **Power of Attorney.** Merchant irrevocably appoints BMF as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BMF from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to  make payment directly  to BMF; and (v) to contact Merchant's b    financial institutions  using  Merchant  and  Guarantor(s)

Initials _____

FILED: KINGS COUNTY CLERK 12/09/2021 01:31 PM INDEX NO. 531515/2021
NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 12/09/2021

# PURCHASED AMOUNT ADDENDUM

This addendum is made as of 10/6/2021 (the "Addendum") to the Agreement for the Purchase and

Sale of Future Receipts between BMF ADVANCE LLC (the "Buyer") and THE (the "Seller")

RESURGENCE CALIFORNIA LLC , Dated 10/6/2021 (the "Agreement")

Buyer and Seller are sometimes referred to herein collectively as the "parties" and each as a

"Party". Whereas the Parties desire to add certain terms to the Agreement.

In consideration of the above promises, and for other good and valuable consideration, the

receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be

legally bound, do hereby agree and add terms to the Agreement as follows,


Purchased amount shall be defined as: $4,920,000.00 if Seller delivers the Future Receipts
within 60 calendar days of the Purchase Price being paid by the Buyer.


SELLER: RESURGENCE CALIFORNIA LLC

NAME: STEPH

SIGNATURE: _Stephen Fennelly_
731BB0136470423...

information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which BMF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant and BMF is authorized to use Merchant's funds to pay for same; and (vii) BMF shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Owner/Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of BMF's choosing in order to settle all obligations due to BMF under this Agreement.

1.12    **Protections against Default.** The following Protections 1 through 8 may be invoked by BMF immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the BMF electronic check processor; (b) Merchant changes    its arrangements with Processor or the Bank in any way that is adverse or unacceptable to BMF; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of BMF, and (ii) the written agreement of any BMF or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to BMF; (e) Merchant takes any action, fails to take any action, or offers any incentive--economic or otherwise-- the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide BMF with copies of any documents related to Merchant's check processing activity of financial and banking affairs within five days after a request from BMF. These protections are in addition to any other remedies available to BMF at law, in equity or otherwise pursuant to this Agreement. **Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.
**Protection 2.** BMF may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
**Protection 3. Intentionally omitted**.
**Protection 4.** BMF may enforce its security interest in the Collateral.
**Protection 5.** The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to BMF from Merchant.
**Protection 6.** BMF may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if BMF recovers a Judgment against Merchant, Merchant shall be liable for all of BMF's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.
**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to BMF. Upon breach of any provision in this Agreement, BMF may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. BMF may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile

signature on a computer- generated check drawn on Merchant's bank account or otherwise for all sums due to BMF.

1.13    **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes BMF to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that BMF obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against BMF or any of its affiliates relating to any (i)investigation undertaken by or on behalf of BMF as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.14    **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by BMF, including this Agreement and any other BMF documents (collectively, "Confidential Information") are proprietary and confidential information of BMF. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of BMF to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles BMF to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

1.15    **Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes BMF to use its, his or her name in listings of clients and in advertising and marketing materials.

1.16    **D/B/A's.** Merchant hereby acknowledges and agrees that BMF may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BMF and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2      REPRESENTATIONS, WARRANTIES, AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1     **Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to BMF, and future statements which will be furnished hereafter at the discretion of BMF, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise BMF of any material adverse change in their financial condition, operation or ownership. BMF may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to BMF within five business days after request from BMF. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

2.2     **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3     **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4     **Use of Funds.** Merchant agrees that it shall use the Purch

Initials

for business purposes and not for personal, family, or household purposes.

2.5 **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without BMF's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6 **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and BMF, nor shall Merchant change any of its places of business without prior written consent by BMF.

2.7 **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8 **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from BMF to Merchant, execute, acknowledge and deliver to BMF and/or to any other person, firm or corporation specified by BMF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9 **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10 **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BMF.

2.11 **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12 **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13 **Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling BMF the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

# 3 EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c) the sending of notice of termination by Merchant or verbally notifying BMF of its intent to breach this Agreement;

(d) the Merchant fails to give BMF 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the

Merchant fails to supply all requested documentation and allow for daily and or real time monitoring of its bank account;

(e) Merchant shall enter into any financing agreements with any other party including but not limited to; Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by seller to any other party.

Merchant shall transfer or sell all or substantially all of its assets;

(f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(g) Merchant shall use multiple depository accounts without the prior written consent of BMF

(h) Merchant shall change its depositing account without the prior written consent of BMF; or

(i) Merchant shall close its depositing account used for ACH debits without the prior written consent of BMF

(j) Merchant's bank returns a code other than NSF cutting BMF from its collections

(k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with BMF.

3.2 **Limited Personal Guaranty.** In the Event of a Default, BMF will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to BMF for all of BMF's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3 **Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, BMF may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of BMF in connection with this Agreement may be exercised at any time by BMF after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4 **Costs.** Merchant shall pay to BMF all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (c) the enforcement of BMF's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.5 **Required Notifications.** Merchant is required to give BMF written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give BMF seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# 4 MISCELLANEOUS

4.1 **Modifications; Agreements.** It is agreed and understood that this Agreement is considered to be made in Connecticut, regardless of Merchant or Guarantor's physical location and Merchant and Guarantor waive any and all rights to make a claim to the contrary. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective, unless the same shall be in writing and signed by BMF. Merchant and Guarantor also agree that they have had to opportunity and/or ability to consult with legal counsel in connection with this Agreement and the terms/conditions contained herein.

4.2 **Assignment.** BMF may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to BMF shall become effective only upon receipt by BMF. Notices to Merchant shall

Initials ___

**4.4    Waiver Remedies.** No failure on the part of BMF to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5    Binding Effect;** Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted in any court sitting in Connecticut, and shall be the sole, only and exclusive venue for any lawsuit, action or proceeding (the "Acceptable Forum"). The parties, including any guarantors, agree that the said sole and exclusive Acceptable Forum is convenient and submit to the jurisdiction of the Acceptable Forum and waive any and all objections to inconvenience of the jurisdiction or venue in any of the Acceptable Forum. Nothing herein shall preclude BMF from domesticating a Judgment against Merchant or any guarantor of this Agreement in another state for purposes of enforcing a judgment obtained in Connecticut.

**4.6    Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7    Interpretation.** All Parties hereto are sophisticated commercial parties and have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice or has had the opportunity to have their own attorney review this Agreement before executing it.  No construction determinations shall be made against either Party hereto as drafter.

**4.8    Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9    Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty herein embody the entire agreement between Merchant and BMF and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10    JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11    CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVEACTION.

**4.12    COMMERCIAL PREJUDGMENT REMEDY WAIVER. EACH AND EVERY MERCHANT AND GUARANTOR OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH BMF MAY BECOME ENTITLED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEEMENTAND (B) ALL RIGHTS TO REQUEST THAT BMF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANT OR GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY BMF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT.**

**IN ADDITION TO ANY OTHER AVAILABLE PREJUDGMENT REMEDIES, AND AS PART OF THE SAID PREJUDGMENT REMEDY WAIVER ABOVE, EACH AND EVERY MERCHANT AND GUARANTOR OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION HEREBY ACKNOWLEDGE, UNDERSTAND, AGREE AND CONSENT THAT BMF MAY ATTACH OR GARNISH ANY AND ALL OF MERCHANT AND GUARANTOR'S MONEY/FUNDS HELD IN ANY BANK ACCOUNT AT A BANKING INSTITUTION IF THAT BANKING INSTITUTION HAS A BRANCH/OFFICE PHYSICALLY LOCATED IN CONNECTICUT AND/OR IS REGISTERED TO CONDUCT BUSINESS IN CONNECTICUT.**

**IT IS FURTHER AGREED AND ACKNOWLEDGED BY MERCHANT AND GUARANTOR THAT BMF IS ENTERING INTO THIS AGREEMENT BASED UPON THE REMEDIES THAT THEY ARE PROVIDING TO BMF HEREUNDER BECAUSE OF THE NATURE OF THE RISKS OF THE CONTEMPLATED TRANSACTION AND BMF WOULD NOT OTHERWISE HAVE ENTERED INTO THIS AGREEMENT AND MERCHANT AND GUARANTOR WAIVE ANY AND ALL OBJECTIONS TO BMF'S RIGHT TO THE EXERCISE THE REMEDIES DESCRIBED HEREIN IN THE EVENT OF A DEFAULT BY MERCHANT OR GUARANTOR UNDER THIS AGREEMENT.  HOWEVER, NOTHING HEREIN SHALL PREVENT MERCHANT OR GUARANTOR FROM CHALLENGING THE AMOUNT OF ANY ATTACHMENT OR GARNISHMENT OR THE DEBT OWED TO BMF UNDER THIS AGREEMENT.**

1.1    **Facsimile & Digital Acceptance.** Facsimile signatures a[nd] digital signatures hereon shall be deemed acceptable for all pur[poses]

Initials _____

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 31 of 115 PageID: 389

**BMF Advance, LLC**

## SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: RESURGENCE CALIFORNIA LLC, AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"  Federal ID#:

D/B/A: RESURGENCE CALIFORNIA

Physical Address:  3151 AIRWAY AVE STE E1    City: COSTA MESA    State: CA    Zip: 92626

Additional Guarantor(s).

## SECURITY AGREEMENT

**Security Interest.**                    This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to BMF a security interest and in lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to BMF under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to BMF upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover BMF's entitlements under this Agreement, BMF is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of BMF's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, BMF or an affiliate of BMF. BMF is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by BMF without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. BMF shall have the right tonotify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, BMF has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, BMF will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from BMF written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and BMF is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets  Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by BMF. Merchant and Guarantor(s) agree(s) to execute and deliver to BMF such instruments and documents BMF may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement  BMF is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to BMF under any other agreement between Merchant or Guarantor(s) and BMF (the "Cross- Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as BMF deems necessary to perfect or maintain BMF's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes BMF to file any financing statements deemed necessary by BMF to perfect or maintain BMF's security interest. Merchant and Guarantor(s) shall be liable for, and BMF may charge and collect, all costs and expenses, including but not limited to attorney's fees, which maybe incurred by BMF in protecting, preserving and enforcing BMF's security interest and rights.

## GUARANTY OF PERFORMANCE

BMF as an additional inducement for BMF to enter into this Agreement, the undersigned Guarantor(s) hereby provides BMF with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement **unless** Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to BMF in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, BMF may seek recovery from Guarantors for all of BMF's losses and damages by enforcement of BMF's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral BMF may hold pursuant to this Agreement or any other guaranty.

BMF does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) BMF's acceptance of this Agreement; and (v) any renewal, extension orother modification of the Merchant Agreement or Merchant's other obligations to BMF. In addition, BMF may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to BMF; (ii) release Merchant from its obligations to BMF; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to BMF under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that BMF must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Prejudgment Remedy Waiver and Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

Initials

Case 1:23-cv-00803-ZNQ-JBD Document 35-1 Filed 08/04/23 Page 32 of 115 PageID: 390



**BMF Advance, LLC**

## SECURITY AGREEMENT AND GUARANTY

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT. INCLUDING THE TERMS AND CONDITIONS.

**FOR THE MERCHANT (#1) By:** STEPHEN JAMES FENNELLY      OWNER

(Signature)

Initials

Social Security Number: _____

Driver's License Number: _____

**FOR THE MERCHANT (#2) By:** _____

(Signature)

Initials_____

Social Security Number: _____

Driver's License Number: _____

**BY OWNER (#1) By:** STEPHEN JAMES FENNELLY      OWNER

(Signature)

Initials

Social Security Number: _____

Driver's License Number: _____

**BY OWNER (#2) By:** _____

(Signature)

Initials_____

Social Security Number: _____

Driver's License Number: _____

**FOR THE GUARANTOR(S) By:** STEPHEN JAMES FENNELLY      OWNER

(Signature)

Initials

Social Security Number: _____

Driver's License Number: _____

**FOR THE GUARANTOR(S) By:** _____

(Signature)

Initials_____

Social Security Number: _____

Driver's License Number: _____

Case 1:23-cv-00803-ZNQ-JBD Document 35-1 Filed 08/04/23 Page 33 of 115 PageID: 391



**BMF Advance, LLC**

APPENDIX A: THE FEE STRUCTURE:

A. **Origination Fee:** <u>$295.00</u> to cover cost of Origination.

B. **Underwriting Fee:** <u>$499.00</u> or 12% of the proposed funding amount to cover underwriting and related expenses. This fee is deemed earned upon Seller signing the contracts. If for whatever reason, Funder determines, in its sole capacity, to cancel the deal, Merchant agrees that Funder may withdraw this non-refundable underwriting fee.

C. **NSF Fee (Standard)** <u>$50.00 (each)</u>

D. **Bank Change Fee** <u>$50.00</u> when Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

E. **CRM Login Fee:** <u>$99</u> per month

F. **Wire Fee -** Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

G. **ACH Program Fee:** <u>$299.00</u> per month for the duration of the agreement.

H. **Stacking:** 10% of Outstanding RTR shall be assessed, in addition to any other damages as a liquidated fee, not as a penalty. Additionally, taking on additional financing will be deemed a breach of this agreement upon which Funder may invoke all of its rights per the terms of the agreement.

I. **UCC Fee:** <u>195.00</u>

J. **Miscellaneous Service Fees:** Merchant agrees that it shall pay for certain services related to the origination and maintenance of the accounts. Merchant shall receive their funding electronically to their Designated Account and shall be charged $50.00 per Fed Wire or $0.00 for an ACH.

**FOR THE MERCHANT (#1) By:** STEPHEN JAMES FENNELLY     OWNER
(Print Name and Title)

DocuSigned by:
*Stephen Fennelly*
731BB01 36470423...
**(Signature** SF **-**
**Initials**

**FOR THE MERCHANT (#2) By:**
(Print Name and Title)

**(Signature)**
**Initials**



**BMF Advance, LLC**

# AUTHORIZATION AGREEMENT
# FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS:**

**BMF:** BMF Advance, LLC

**Seller:** RESURGENCE CALIFORNIA LLC, AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
(Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between BMF and Seller, dated as of ___10/06/2021___

**Designated Checking Account:**

Bank Name: _____     Branch: _____

Tax ID: ████████████████████

ABA: Routing: _____     DDA: Account: _____

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records.**

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes BMF to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Seller also authorizes BMF to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: _$34,999.00_

(or) Percentage of each Banking Deposit: _____ %

on the Following Days (each, a "Payment Date"): _Monday - Friday_

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that BMF may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes BMF to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** BMF is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until BMF has received written notification from Seller at the address set forth below at least 5 banking days prior of its termination to afford BMF a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Seller: RESURGENCE CALIFORNIA LLC, AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
(Merchant's Legal Name)

Title: _____

DocuSigned by:
*Stephen Fennelly*
731BB0136470423...
(Signature)

Print Name: STEPHEN JAMES FENNELLY      OWNER

Date: _____10/06/2021_____
Month / Day / Year

DS
SF

Initials: _____

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 35 of 115 PageID: 393



**BMF Advance, LLC**

Dear Merchant,

Thank you for accepting an offer from BMF Advance. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please email the agreement to your funding specialist.

**Please provide information required for read-only access\* to your business account.**

**\*Be sure to indicate capital or lower-case letters.**

**Bank Portal Website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____

_____

_____

DS
*SF*

**Initials**_____

INDEX NO. 531515/2021
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 12/09/2021

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 36 of 115 PageID: 394

**BMF Advance, LLC**

ADDENDUM TO CONTRACT

This Addendum entered on  10/06/2021  is to certify that I,  STEPHEN JAMES FENNELLY     OWNER  as a representative of
RESURGENCE CALIFORNIA LLC, AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A" , am prohibited from initiating a cash advance or other loan products with another lender outside to BMF Advance. Doing so will place me in a breach of contract and I will be liable for the entire amount owed to BMF Advance immediately, plus attorneys' fees, costs, and liquidated damages of $2,500 or 10% of the contract amount, whichever is greater.

Amounts received from any subsequent merchant cash advances will be subject to collections by BMF Advance to satisfy the outstanding account balance.
By their signatures below the parties agreed to be bound by this addendum.

**By:**   Name  STEPHEN JAMES FENNELLY     OWNER

**Title:**

DocuSigned by:

*Stephen Fennelly*

731BB0'36470423...
**(Signature)**

*SF*
DS

**Initials**

**MERCHANT #2** (Print Name)

**By:**   Name

**Title:**

**(Signature)**

**Initials**

BMF ADVANCE, LLC

**By:**

**ADDENDUM**

**This authorization is to remain in full force and effect until BMF Advance receives written notification from the Merchant of its termination in such time and in such manner to afford BMF Advance a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.

Case 1:23-cv-00803-ZNQ-JBD Document 35-1 Filed 08/04/23 Page 37 of 115 PageID: 395



**BMF Advance, LLC**

## ACH AUTHORIZATION FORM
All information on this form is required unless otherwise noted.

### BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT

BMF ADVANCE, LLC
Authorized Business Name                    Authorized Business Phone Number

_____    _____    _____    _____
Authorized Business Address              City                State      Zip

### ACCOUNT HOLDER INFORMATION

STEPHEN JAMES FENNELLY      OWNER
Account Holder Full Name                 Account Holder DBA Name (If Business        Phone Number
                                         Account)

_____
Account Holder Address

### ACCOUNT HOLDER BANK INFORMATION

_____    _____    _____    _____
Account Holder Bank Name                 Branch City              State      Zip

*How to find your Routing and Account Numbers on a check*    Bank Routing Number (9 digits)

| ⑈ 123456789 ⑈ 1234567890123 ⑈' |
| Bank Routing Code    Bank Account Number |

Bank Account Number

### TRANSACTION INFORMATION

Goods Purchased/Services Rendered

                                         10/06/2021        | On time        Recurring |
_____                    _____      | Rate_____ |
Amount of Transaction                    Effective Date    | No. of Transactions_____  or Open Ended |

### AUTHORIZATION

In exchange for products and/or services listed above the undersigned hereby authorizes: _____ to electronically draft via Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writhing by the above-listed account holder. The undersigned individual hereby certifies that he/she is duly authorized to execute this form on behalf of the above-listed account holder. The above-listed account holder acknowledges that it is subject a $25 reject fee if items are returned for insufficient funds.

DocuSigned by:

*Stephen Fennelly*
731BB0'38470423...

STEPHEN JAMES FENNELLY    OWNER        _____        **Signature**        10/06/2021
Name of Account Holder                 Title of Account Holder                   Date

                                                                                   *SF*
                                                                                   Initials _____

FILED: KINGS COUNTY CLERK 12/09/2021 01:31 PM
NYSCEF DOC. NO. 2

INDEX NO. 531515/2021
RECEIVED NYSCEF: 12/09/2021



**BMF Advance, LLC**

BALANCE TRANSFER FORM

**Merchant Legal Name ("Merchant"):**  STEPHEN JAMES FENNELLY     OWNER

**Merchant Title:**

**Business Legal Name ("Business"):**  RESURGENCE CALIFORNIA LLC, AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**DBA:**  RESURGENCE CALIFORNIA

**Physical Address:**  3151 AIRWAY AVE STE E1

**City:**  COSTA MESA

**State:**  CA

**Zip Code:**  92626

**Date:**  10/06/2021

**BMF Advance, LLC**
**157 Church Street - Suite 1971**
**New Haven, CT 06510**

**Date of previous secured agreement:** 7/26/21

**Remaining RTR balance:** $3,583,200.00

To Whom It May Concern:
I, Merchant, on behalf of Business, hereby authorize BMF Advance, LLC to debit the remaining RTR balance which is currently due and owing to BMF Advance, LLC pursuant to the previous secured merchant agreement, entered into by and between BMF Advance, LLC and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by BMF Advance, LLC pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,

By: _Stephen Fennelly_
731BB0136470423...
(Signature)

**Merchant Legal Name:** STEPHEN JAMES FENNELLY     OWNER

**Title:** SF

**Initials:**

FILED: KINGS COUNTY CLERK 12/09/2021 01:31 PM
NYSCEF DOC. NO. 2
INDEX NO. 531515/2021
RECEIVED NYSCEF: 12/09/2021

# EXHIBIT A

LIST OF ADDITIONAL PARTIES IN WHOSE ASSETS SELLER HAS GRANTED BUYER
A BLANKET SECURITY INTEREST:

**BALBOA HORIZONS RECOVERY SERVICES**

129 CABRILLO ST COSTA MESA CA 92627

EIN:

**COMMISSIONS EARLY LLC**

3151 AIRWAY AVE STE E1 COSTA MESA CA 92626

EIN:

**A NEW START TREATMENT AND RECOVERY CENTER LLC D/B/A MUSE TREATMENT**

1251 WESTWOOD BLVD LOS ANGELES CA 90024

EIN:

**RESURGENCE BEHAVIORAL HEALTH LLC**

3151  AIRWAY AVE STE E1 COSTA MESA CA 92626

EIN:

**RESURGENCE TENNESSEE LLC**

3151 AIRWAY AVE STE E1 COSTA MESA CA 92626

Buyer may file a UCC 1 financing statement with the appropriate Secretary of State(s)
reflecting a blanket security interest in the assets of the above listed entities.

Dated:October 6 ,2021



By: _____
STEPHEN  JAMES  FENNELLY

# EXHIBIT B

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 41 of 115 PageID: 399

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
EMPIREMEDIHOLDINGS, LLC,

                          Plaintiff,

       -against-

BRIDGE FUNDING CAP LLC d/b/a
MERCHANT CAPITAL, CLOUDFUND, LLC,
LIFETIME FUNDING, LLC, BMF ADVANCE,
LLC, EBF HOLDINGS, LLC d/b/a EVEREST
BUSINESS FUNDING, ALVA ADVANCE, LLC, and
22 CAPITAL, INC.,

                         Defendants.
------------------------------------------------------------------------X

Index No.: 656511/2021

**AFFIDAVIT**

COMMONWEALTH OF PUERTO RICO   )
                                    ) ss.
MUNICIPALITY OF DORADO          )

       Stephen J. Fennelly, being duly sworn, deposes and says the following under the penalty of perjury:

       1.       I am over the age of 18 and reside in the State of California.  My business address is 3151 Airway Avenue, Suite M1, Costa Mesa, California 92626.

       2.       I am the former owner of Resurgence Behavioral Health LLC ("RBH"), Resurgence California LLC d/b/a Resurgence California ("RC"); A New Start Treatment & Recovery, LLC d/b/a Muse ("Muse"); Balboa Horizons Recovery Services Inc. ("Balboa"); Coastal Recovery, Inc. ("Coastal Recovery"); Coastal Recovery Health & Wellness, Inc. ("Coastal Health"); Commissions Early, LLC ("Commissions Early"); and Pearl of the Sea Retreat, LLC's ("Pearl" and, collectively with RBH, RC, Muse, Balboa, Costal Recovery, Costal Health, and Commissions Early, the "Merchants").

1

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 42 of 115 PageID: 400

3.      RBH is the parent company of the other Merchants.  RC is the active company that operates a substance abuse treatment program in California and was "in-network" with various health insurance companies.  At various times RC acquired ARS, Muse, Balboa, Coastal Recovery, Coastal Health, and Pearl, which were all independent substance abuse treatment programs that were "out-of-network" with the RC's affiliated insurance companies.  RC acquired these companies in order to transfer their licensed "patient beds" to RC to expand the number of patients that RC could treat at its substance abuse treatment program.  Once the "patient beds" were transferred to RC, they would be covered as "in-network" services by RC's affiliated insurance companies.  Once RC acquired these entities, they ceased any independent operations.

4.      I am the current sole owner of Advanced Recovery Solutions, LLC ("ARS"), Better Soul Inc. ("Better Soul"), Resurgence Tennessee LLC d/b/a Resurgence TN ("Resurgence TN"), and Resurgence TX, LLC d/b/a Resurgence Texas ("Resurgence TX" and, collectively with ARS, Better Soul and Resurgence TN, the "Merchants' Affiliates").  Other than ARS, which is now defunct, the Merchants' Affiliates operate various substance abuse treatment programs California, Tennessee, and Texas.

5.      Additionally, A Plus C Quality Construction LLC ("A Plus C") was a construction company that I operated in the past.  A Plus C ceased operations approximately twenty years ago.

**I.      The Merchants' MCA Agreements.**

6.      Beginning in 2020, the Merchants and the Merchants' Affiliates took out a series of merchant cash advances (the "MCA Agreements") in order to expand their business by acquiring new substance treatment companies.  Originally, the MCA Agreements were intended to be bridge financing for the Merchants and Merchants' Affiliates until they could obtain more

2

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 43 of 115 PageID: 401

traditional financing. Ultimately, the Merchants and the Merchant' Affiliates were unable to obtain traditional financing and continued to enter into new MCA Agreements.

7.     Specifically, the Merchants and the Merchants' Affiliates entered into the following MCA Agreements:

a.     On October 29, 2020, RC and RBH (collectively, the "West Coast MCA Merchants") and myself, individually as a guarantor, entered into a Future Receivables Sale and Purchase Agreement (the "West Coast MCA Agreement") with West Coast Business Capital, LLC ("West Coast") for the sale of $675,000.00 (the "West Coast Purchased Receivables") of the West Coast MCA Merchants' future receivables for a payment to the West Coast MCA Merchants of $500,000.00 (the "West Coast Purchase Price"), less certain fees. Pursuant to the West Coast MCA Agreement, the West Coast MCA Merchants were required to make daily payments of $4,822.00 (the "West Coast Daily Payment") every business day through a direct payment via the Automated Clearing House ("ACH") network;

b.     On December 31, 2020, RC; A Plus C; ARS; Balboa; Better Soul; Commissions Early; Coastal Health; Costal Recovery; Muse; Pearl; The Well Recovery Partners, Inc. ("Well Recovery Partners" and, collectively, the "Iruka MCA Merchants") and myself, individually as a guarantor, entered into a Future Receivables Sale and Purchase Agreement (the "Iruka MCA Agreement") with Iruka Capital Group LLC ("Iruka") for the sale of $1,993,575.00 (the "Iruka Purchased Receivables") of the Iruka MCA Merchants' future receivables for a payment to the Iruka MCA Merchants of $1,425,000.00 (the "Iruka Purchase Price"), less certain fees. Pursuant to the Iruka MCA Agreement, the Iruka MCA Merchants were required to make daily payments of $19,935.75 (the "Iruka Daily Payment") every business day through a direct payment via ACH;

c.     On August 18, 2021, RBH; RC; ARS; Muse; Resurgence CA, LLC; Resurgence TX (collectively, the "Merchant Capital MCA Merchants") and myself, individually as a guarantor, entered into a Revenue Purchase Agreement (the "Merchant Capital MCA Agreement") with Bridge Funding Cap LLC d/b/a Merchant Capital ("Merchant Capital") for the sale of $699,500.00 (the "Merchant Capital Purchased Receivables") of the Merchant Capital MCA Merchants' future receivables for a payment to the Merchant Capital MCA Merchants of $500,000.00 (the "Merchant Capital Purchase Price"), less certain fees. Pursuant to the Merchant Capital MCA Agreement, the Merchant Capital MCA Merchants were required to

3

Case 3:23-cv-00803-ZNQ-JBD Document 35-1 Filed 08/04/23 Page 44 of 115 PageID: 402

make daily payments of $8,744.00 (the "Merchant Capital Daily Payment") every business day through a direct payment via ACH;

d.  On October 6, 2021, RC; Balboa; Commissions Early; Muse; RBH; Resurgence TN (collectively, the "BMF Advance MCA Merchants") and myself, individually as a guarantor, entered into a Secured Purchase Agreement (the "BMF MCA Agreement") with BMF Advance LLC ("BMF Advance") for the sale of $5,658,000.00 (the "BMF Advance Purchased Receivables") of the BMF Advance MCA Merchants' future receivables for a payment to the BMF Advance MCA Merchants of $4,100,000.00 (the "BMF Advance Purchase Price"), less certain fees. Pursuant to the BMF Advance MCA Agreement, the BMF Advance MCA Merchants were required to make daily payments of $34,999.00 (the "BMF Advance Daily Payment") every business day through a direct payment via ACH;

e.  On October 14, 2021, RBH, Resurgence TX, Resurgence TN, Pacific Manor Recovery ("Pacific Manor"), RC, Muse (collectively, the "Cloudfund MCA Merchants") and myself, individually as a guarantor, entered into a Future Receipts Sale and Purchase Agreement (the "Cloudfund MCA Agreement") with Cloudfund LLC ("Cloudfund") for the sale of $372,500.00 (the "Cloudfund Purchased Receivables") of the Cloudfund MCA Merchants' future receivables for a payment to the Cloudfund MCA Merchants of $250,000.00 (the "Cloudfund Purchase Price"), less certain fees. Pursuant to the Cloudfund MCA Agreement, the Cloudfund MCA Merchants were required to make daily payments of $4,656.25 (the "Cloudfund Daily Payment") every business day through a direct payment via ACH;

f.  Additionally, the Merchants and the Merchants' Affiliates entered into MCA Agreements with: (1) 22 Capital, Inc. (the "22 Capital MCA Agreement"); (2) Alva Advance, LLC (the "Alva MCA Agreement"); (3) EBF Holdings, LLC (the "EBF MCA Agreement"); and (4) Lifetime Funding, LLC (the "Lifetime MCA Agreement"). I do not have the specific details of the 22 Capital MCA Agreement, the Alva MCA Agreement, the EBF MCA Agreement and/or the Lifetime MCA Agreement. I no longer have access to my former email account with the Merchants.

8.  Pursuant to all of the MCA Agreements, the Merchants and Merchants' Affiliates obligations under the MCA Agreements were secured by a security interest (the "MCA Security

4

Interests") in substantially all of the Merchants and the Merchants' Affiliates assets. The MCA Security Interests were allegedly perfected by the filing of various UCC-1 Financing Statements.

9. While the various Merchants and Merchants' Affiliates were listed on the MCA Agreements, substantially all of the receivables generated by the Merchants were in the name of RBH.

## II. The Sale of the Merchants and the Legal Strategy to Block Enforcement of the MCA Agreements.

10. As part of the Merchants and Merchants' Affiliates efforts to find alternative financing, I contacted DML Capital Group Incorporated ("DML"). DML is a company that specialized in healthcare receivable funding through traditional factoring. Ultimately, after speaking with John Ferguson at DML, I was unable to obtain traditional factoring for the Merchants and the Merchants' Affiliates.

11. Around April, 2021, I began exploring selling the Merchants and/or the Merchants' Affiliates (the "Sale of the Merchants") to a third-party who could subsequently resolve the Merchants and the Merchants' Affiliates obligations under the various MCA Agreements and allow the Merchants and the Merchants' Affiliates to continue their operations.

12. At that time, John Ferguson introduced me to David Dwek ("Dwek") and David Lax ("Lax") and I began discussing the Sale of the Merchants with them. Dwek, Lax, Mark Chemtob, and Mayer Chemtob (the "Retro Capital Owners") were the owners of a company named Retro Capital Group, LLC ("Retro Capital"). Retro Capital expressed interest in purchasing the Merchants and/or the Merchants' Affiliates.

13. The Retro Capital Owners are all family members. Mark Chemtob is Mayer Chemtob's father, Dwek's father-in-law, and Lax's uncle.

5

14.     Nathan Fransen, Esq. ("Fransen"), the attorney for the Merchants and the Merchants' Affiliates, contacted the Retro Capital Owners to discuss the terms of the Sale of the Merchants.  At that time, Fransen and the Retro Capital Owners discussed, among other things, the MCA Agreements and potential strategies to resolve the Merchants' and the Merchants' Affiliates' obligations under the MCA Agreements.

15.     The Retro Capital Owners advised Fransen of Retro Capital's strategy of forming a new entity, EmpireMediHoldings, LLC ("EmpireMediHoldings") for the specific purpose of taking an assignment of the Iruka MCA and the associated UCC-1 Financing Statement (the "Iruka UCC-1").  The Retro Capital Owners explained that EmpireMediHoldings would become the owner of the first-priority UCC-1 Financing Statement and would be able to file a lawsuit to prevent any junior secured creditors from enforcing their security interests against the Merchants and myself.

16.     Between April, 2021 and November 30, 2021, Fransen and I engaged in various discussions with the Retro Capital Owners regarding the Sale of the Merchants and how to structure the new entities to avoid paying the obligations owed to the MCA Companies.  I met with the Retro Capital Owners in person approximately three times.  Once, I met them in New York and they flew to Los Angles twice to inspect the Merchants' substance abuse treatment facilities (approximately 30 – 60 days before the Merchants' Sale Closing (as defined below) and again 2 – 3 weeks prior to the Merchants' Sale Closing).

17.     On October 4, 2021, Retro Capital send me a letter of intent (the "Retro Capital LOI") offering to purchase the Merchants for the sum of $22.3 million dollars (the "Merchants Sale Purchase Price").  A copy of the Retro Capital LOI is attached as **Exhibit A**.

6

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 47 of 115 PageID: 405

18.     Pursuant to the Retro Capital LOI, Retro Capital was to pay the Merchants Sale Purchase Price as follows:

    a.      A $1 million payment at the closing (the "Merchants' Sale Closing") of the Sale of the Merchants;

    b.      Retro Capital would pay the MCA Debt on behalf of the Merchants and the Merchants' Affiliates;

    c.      A $1 million payment on the three-month anniversary of the Merchants' Sale Closing;

    d.      The remaining net balance of the Merchants' Sale Purchase Price would be paid in six equal monthly installments on the seventh-month through twelfth-month anniversary of the Merchants' Sale Closing.

19.     Part of Retro Capital's plan in dealing with the MCA Companies was to keep $7 million of the Merchants Sale Purchase Price in reserve to settle for reduced amounts with the various MCA Companies.  Any amount of the $7 million left after all of the MCA Agreements had been satisfied would come to me as part of the Merchants Sale Purchase Price.

20.     After a licensing issue arose at RC, the Merchants Sale Purchase Price was reduced to $14.5 million.  Additionally, I made a $3 million loan (the "A/R Loan") to A New Horizon, LLC ("A New Horizon"), the entity that ultimately purchased the Merchants, allowing it to directly receive accounts' receivable due to the Merchants' Affiliates.

21.     To date, I have not received $5.5 million of the Merchants' Sale Purchase Price or been repaid any of the A/R Loan.

22.     On October 25, 2021, Iruka sent a UCC Lien Notice and Notice of Assignment of Accounts-Receivable by Assignor to Iruka Capital Group LLC, as Assignee (the "Iruka UCC Lien Notice") to various account debtors (the "Merchants' Account Debtors") of the Merchants, including Aetna Health and Life Insurance Company ("Aetna") and Managed Health Network,

7

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 48 of 115 PageID: 406

LLC ("MHN").  A copy of the Iruka UCC Lien Notice is attached as **Exhibit B**.  As a result of the Iruka UCC Lien Notice, the Merchants' Account Debtors ceased remitting accounts receivable that were owed to the Merchants.

23.     On November 4, 2021, the Retro Capital Owners formed EmpireMediHoldings in order to take an assignment of the Iruka MCA and the Iruka UCC-1.

24.     On November 5, 2021, Iruka assigned EmpireMediHoldings the Iruka MCA and the Iruka UCC-1.

25.     After that date, EmpireMediHoldings immediately ceased any and all collection efforts against the Merchants and released the hold created by the Iruka UCC Lien Notice with the Merchants' Account Debtors.  There have been no further actions by EmpireMediHoldings to enforce the Merchants' obligations the Iruka MCA.

26.     On November 15, 2021, EmpireMediHoldings commenced this lawsuit.  I became aware that Colonna Cohen Law, PLLC ("CCL") and Ashlee Colonna Cohen, Esq. ("Colonna Cohen") and, collectively with CCL, the "Colonna Cohen Law Firm") represents EmpireMediHoldings in this lawsuit.

27.     In connection with this lawsuit, on November 16, 2021, EmpireMediHoldings filed an Order to Show Cause seeking a Temporary Restraining Order (the "EmpireMediHoldings TRO") preventing the MCA Companies from enforcing the obligations pursuant to the MCA Agreement against the Iruka Merchants.

28.     On November 17, 2021, the Court entered the EmpireMediHoldings TRO, which prevented the MCA Companies from enforcing the MCA Agreements and the MCA Security Interests against the Iruka Merchants.  This occurred exactly how Retro Capital, Dwek, and Lax envisioned.

8

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 49 of 115 PageID: 407

29.     After the enforcement of the MCA Agreements and the MCA Security Interests ceased, the Merchants (and most importantly RBH) were able to resume collecting all of their accounts receivable without having to pay the Daily Payments.  The Merchants and the Merchants' Affiliates were able to continue operating.

30.     On November 30, 2021, with the Merchants and Merchants' Affiliates cash flow issues solved, I was able to move forward with the Equity Interest Purchase Agreement By and Among A New Horizon, LLC, Stephen Fennelly, and Resurgence Behavioral Health, LLC (the "A New Horizon Purchase Agreement"), which formally memorialized the terms of the Retro Capital LOI and substituted A New Horizon (an affiliate of Retro Capital) as the purchaser of the Merchants, and proceed to Merchants' Sale Closing.

31.     Since November 30, 2021, I am no longer the owner of the Merchants and am not involved in the day-to-day operations of their business.

**III.    Colonna Cohen Law, PLLC and Ashlee Colonna Cohen, Esq.'s Unauthorized Representation of the Merchants, the Merchants' Affiliates, and/or Myself in Various Pending Lawsuits.**

**A.     The Merchant Capital Lawsuit.**

32.     On October 26, 2021, Merchant Capital commenced a lawsuit against the Merchant Capital MCA Merchants and me, individually (collectively, the "Merchant Capital Defendants") in the matter captioned Merchant Capital v. Resurgence California, LLC, et al., Supreme Court of the State of New York, County of Ontario, Index No. 130964-2021 (the "Merchant Capital Lawsuit") related to alleged breaches of the Merchant Capital MCA Agreement.  A copy of the Summons and Verified Complaint in the Merchant Capital Lawsuit is attached as **Exhibit C**.

33.     I became aware that on November 23, 2021, the Colonna Cohen Law Firm filed an unverified answer (the "Merchant Capital Lawsuit Answer") purportedly on behalf of the

9

Merchant Capital Defendants, including myself. A copy of the Merchant Capital Lawsuit Answer is attached as **Exhibit D**.

34.     I never retained the Colonna Cohen Law Firm in any capacity and never authorized the Colonna Cohen Law Firm to represent me, individually, or any of the other Merchant Capital Defendants. I was still the owner of the Merchant Capital Defendants at the time the Merchant Capital Lawsuit Answer was filed with the Court. I have never spoke with Colonna Cohen or anyone at CCL. I have never signed an engagement letter or retainer agreement with the Colonna Cohen Law Firm. I have no idea how the Colonna Cohen Law Firm arrived at any of the factual admissions or denials set forth in the Merchant Capital Lawsuit Answer.

> **B.     The Cloudfund Lawsuit.**

35.     On November 3, 2021, Cloudfund commenced a lawsuit against Cloudfund MCA Merchants and me, individually (collectively, the "Cloudfund Defendants") in the matter captioned Cloudfund LLC v. Resurgence Behavioral Health, LLC, et al., Supreme Court of the State of New York, County of Queens, Index No. 724521 (the "Cloudfund Lawsuit") related to alleged breaches of the Cloudfund MCA Agreement. A copy of the Summons and Verified Complaint in the Cloudfund Lawsuit is attached as **Exhibit E**.

36.     On December 8, 2021, it appears the Cloudfund Lawsuit was settled as a Notice of Discontinuance with Prejudice (the "Cloudfund Notice of Discontinuance") was filed in the Cloudfund Lawsuit. A copy of the Cloudfund Notice of Discontinuance is attached as **Exhibit F**. I have no involvement in the Cloudfund Lawsuit and did not authorize any attorney, including (and specifically) the Colonna Cohen Law Firm, to represent me or otherwise act on my behalf in connection with the Cloudfund Lawsuit. I did not retain any attorney in connection with the Cloudfund Lawsuit. Moreover, while I owned the Merchants and the Merchants' Affiliates, I did

not authorize any attorney, including (and specifically) the Colonna Cohen Law Firm, to represent any of the Merchants and/or the Merchants' Affiliates in the Cloudfund Lawsuit.

### C.     The BMF Advance Lawsuit.

37.     On December 9, 2021, BMF Advance commenced a lawsuit against the BMF Advance MCA Merchants and me, individually (collectively, the "BMF Advance Defendants") in the matter captioned BMF Advance LLC v. Resurgence California, LLC, et al., Supreme Court of the State of New York, County of Kings, Index No. 531515/2021 (the "BMF Advance Lawsuit") related to alleged breaches of the BMF Advance MCA Agreement.  A copy of the Summons and Verified Complaint in the BMF Advance Lawsuit is attached as **Exhibit G**.

38.     I became aware that on March 7, 2022, the Colonna Cohen Law Firm filed a Notice of Appearance (the "BMF Advance Notice of Appearance") in the BMF Advance Lawsuit purporting to represent all of the BMF Advance Defendants, including myself, individually.  A copy of the BMF Advance Notice of Appearance is attached as **Exhibit H**.

39.     Once again, I never retained the Colonna Cohen Law Firm in and capacity and never authorized the Colonna Cohen Law Firm to represent me, individually, or any of the other BMF Advance Defendants when I owed the Merchants.  I have never spoke with Colonna Cohen or anyone at CCL.  I have never signed an engagement letter or retainer agreement with the Colonna Cohen Law Firm.  I have no idea why the Colonna Cohen Law Firm filed the BMF Advance Notice of Appearance allegedly representing me.

### D.     The Settlement of the 22 Capital MCA Agreement , the Alva MCA Agreement, EBF MCA Agreement, and the Lifetime MCA Agreement.

40.     I became aware that on December 1, 2021, the Colonna Cohen Law Firm filed a Notice of Discontinuance (the "EmpireMediHoldings Notice of Discontinuance") in the case at bar discontinuing the case at bar with prejudice against 22 Capital, Inc., Alva Advance, LLC, EBF

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 52 of 115 PageID: 410

Holdings, LLC d/b/a Everest Business Funding, Lifetime Funding, LLC, and Cloudfund.  A copy of EmpireMediHoldings Notice of Discontinuance is attached as **Exhibit I**.

41.     I do not know exactly why the EmpireMediHoldings discontinued the case at bar against the above listed parties, but because such discontinuance was with prejudice, I suspect it was pursuant to a settlement agreement between EmpireMediHoldings and those parties.

42.     Once again, I never retained the Colonna Cohen Law Firm in and capacity and never authorized the Colonna Cohen Law Firm to represent me, individually, or any of the Merchants and/or Merchants' Affiliates that were parties to the 22 Capital MCA Agreement , the Alva MCA Agreement, EBF MCA Agreement, and the Lifetime MCA Agreement when I owed the Merchants.  I have never spoke with Colonna Cohen or anyone at CCL.  I have never signed an engagement letter or retainer agreement with the Colonna Cohen Law Firm.

[CONTINUED BELOW]

12

43.     To the extent that any settlement agreement was entered into with any of the above listed parties that either includes myself individually or any of the Merchants' Affiliates, it was unauthorized.  Moreover, to the extent that any settlement agreement was entered into with any of the above listed parties with the Merchants when I still owned them, such a settlement was also unauthorized.

Dated: ~~Costa Mesa, California~~ *Dorado Beach, Puerto Rico*
August 26 2022

_____
Stephen J. Fennelly

On August 26th 2022, before me, the undersigned notary public, personally appeared Stephen J. Fennelly, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public     # 18,252

Aff # 132
Commission : never expires

LIZZIE M. MEDINA CORIS
ABOGADA-NOTARIA

13

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 54 of 115 PageID: 412

**<u>EXHIBIT A</u>**

The Retro Capital LOI

RETRO CAPITAL GROUP, LLC

October 4, 2021

Steve Fennelley
Founder and Chief Executive Officer
Resurgence Behavioral Health, LLC
3151 Airway Avenue E1
Costa Mesa CA 92626

### RE: Offer to Acquire Resurgence Behavioral Health, LLC

Dear Steve,

Pursuant to our recent conversations and past meetings and based upon the information received to date, Retro Capital Group, LLC or an affiliate ("Buyer" or "Retro") is pleased to put forth this acquisition proposal (the "Transaction") via a Letter of Intent ("Letter of Intent") to acquire Resurgence Behavioral Health, LLC and its affiliated companies that operate substance abuse treatment programs in California, Tennessee and Texas ("Resurgence" or the "Company"):

This proposal reflects an aggregate $22.5 million enterprise valuation based upon a cash free/debt-free balance sheet. The foregoing enterprise value is inclusive of any positive net attributes. The Purchase Price shall be paid as described in the Term Sheet attached as Exhibit A hereto (the "Term Sheet"). The Purchase Price shall be paid net of: (i) all Seller (as defined below) and Company-related Transaction fees and expenses, (ii) all accrued but unpaid management bonuses and severance as of the Closing that is payable to former employees, and (iii) all existing indebtedness, liabilities or obligations (including accounts payable and current liabilities) of the Company and its affiliates that encumber or relate to the Company or its assets.

We are committed to an expeditious due diligence process subject to timely responses to our and our advisors' due diligence requests. In parallel with our due diligence, the Company, the owner of the Company ("Seller") and Buyer will enter into a definitive purchase agreement (the "Purchase Agreement") which shall reflect terms outlined in the Term Sheet, and which would be subject to our due diligence and customary conditions to Closing, including material third party approvals and consents.

Our due diligence shall include the following performed by diligence partners selected by Buyer:

   a) Accounting/quality of earnings/additive review;
   b) Legal diligence including Company capital structure, indebtedness and liabilities;
   c) Healthcare regulatory & legal diligence;
   d) Compliance diligence; and
   e) Management background checks.

   1.    Term Sheet. Based on our current understanding of the Company, we anticipate the Transaction would be on the terms summarized in the attached Term Sheet.

1

RETRO CAPITAL GROUP, LLC

2. _Access to Information._ The Company and Seller shall promptly furnish to Buyer (and its financial and professional advisors, lenders and lenders' representatives, and permit Buyer (and its advisors, lenders and representatives) all requested due diligence information, and shall provide unrestricted access to such information, materials and personnel as may be reasonably necessary or advisable to allow the completion of financial, business, regulatory and legal diligence with respect to the Company.

3. _Public Disclosures._ The parties shall consult with one another and must agree in writing in advance concerning the form and substance of any press release or other public disclosure of the matters covered by this Letter of Intent, and shall make a diligent effort to prohibit their respective representatives from granting press interviews or engaging in similar actions that would result in public disclosure of such matters; provided, however, that these obligations shall not be deemed to prohibit any party from making any disclosure which such party deems reasonably necessary in order to fulfill such party's disclosure obligations imposed by law.

4. _Conduct of Business._ During the Exclusivity Period (as defined below), the Company shall, and Seller shall cause the Company and its subsidiaries and affiliates, to (i) conduct their respective businesses in a reasonable and prudent manner in accordance with past practices, including hiring and terminating personnel, (ii) preserve their existing business organizations and relations with their employees, customers, suppliers and others with whom they have a business relationship in the ordinary course of business, (iii) preserve and protect their properties and properties and conduct their business in compliance with all applicable laws and regulations; (iv) maintain compliance with applicable laws, regulations and contractual obligations, (v) refrain from incurring any additional debt or liabilities or transferring any of their business assets to any third party or affiliated party, and (vi) promptly notify Buyer of any material change or event that may reasonably be material to the Company, its operations or assets or the Transaction.

5. _Exclusivity._ During the period commencing upon the parties' execution of this Letter of Intent and extending **through November 4, 2021** (the "**Exclusivity Period**"), the Company and Seller (i) agree to deal, directly and indirectly, exclusively with Buyer regarding the acquisition of the Company and/or its assets, (ii) agree not to, and agree to cause their respective officers, directors, partners, stockholders, members, employees, principals, agents, representatives and advisors ("**Representatives**") not to, directly or indirectly, solicit, negotiate, participate in or continue or have any discussion, or enter into any agreements, arrangements or understandings, with any person or entity relating to any sale by Seller of equity interests in, or any merger or sale of securities or substantial assets of, the Company or any of its subsidiaries (including any transfer of business assets to any third party or affiliated party, or (with the exception of factoring any Accounts Receivables for services rendered prior to Closing, or obtaining credit for the purpose of servicing or paying off existing debt) any recapitalization or financing (including incurring any additional debt or liabilities), investment or public offering transaction, or any similar transaction or alternative to any of the foregoing that conflicts with or defeats the purpose of this Letter of Intent, and (iii) agree not to, and agree to cause their respective Representatives not to, encourage any third party to inform any action to accomplish or facilitate any of the foregoing. The Company and Seller shall promptly terminate all discussions with respect to transactions involving any of

79514736 11

RETRO CAPITAL GROUP, LLC

the foregoing involving the Company other than with Buyer and shall promptly inform Buyer of any offer, indication of interest or proposal hereafter received from any third party, including the identity of the offeror and the relevant terms. The Exclusivity Period shall automatically extend for successive 15-day periods unless the Company and Seller, on the one hand, or Buyer, on the other hand, provides the other party, at least two days prior to such automatic renewal, written notice that the Exclusivity Period shall not renew.

6.    Confidentiality. Buyer and its respective affiliates and advisors, Seller, the Company, and the Company's affiliates and advisors shall keep all information regarding the Transaction (including the terms and existence of this Letter of Intent) in strictest confidence and not disclose such information to any third party, except to their respective representatives, agents, financing sources and advisors who need to know such information to solely to assist in the review and completion, of the Transaction; and in such event, the disclosing Party shall require any such parties to maintain in strict confidence any such information.

7.    Good Faith; Binding/Non-Binding provisions. Each party agrees to negotiate the terms and conditions of the Purchase Agreement in good faith, it being understood and agreed that (i) this Letter of Intent does not purport to set forth all of the terms and conditions of the Transaction, (ii) with respect to those terms and conditions of the Transaction addressed in this Letter of Intent, this Letter of Intent does not purport to set forth all matters with respect to such terms and conditions, and (iii) the terms and conditions of the Transaction set forth in this Letter of Intent may change as a result of, among other things, Buyer's due diligence review. Notwithstanding the foregoing, the parties acknowledge that Sections 2, 3, 4, 5, 6, 7, 9 and 10 of this Letter of Intent are intended to be and shall be legally binding on each of the parties, but that the other provisions of this Letter of Intent are not intended to be and shall not be legally binding.

8.    Mutual Cooperation. The parties shall cooperate in their efforts to cause the Transaction to be consummated, and in making or assisting in preparing or furnishing all information needed for such regulatory filings as may, in the opinion of counsel for Buyer, be necessary or advisable to complete the Transaction.

9.    Governing Law; Attorney's Fees. This Letter of Intent shall be governed by the laws of the State of Delaware without giving effect to principles of conflict or choice of laws, and the parties agree to the jurisdiction of the federal and state courts of such jurisdiction for any legal proceedings resulting or relating to the terms hereof. In the event of any litigation arising from or relating to a breach of any provision hereof, or any other matter pertaining to the matters or transactions contemplated herein, the prevailing party shall be entitled to award of its costs and expenses (including reasonable attorney's fees) incurred in any such matter.

10.    Entire Agreement; Counterparts; Amendment. This Letter of Intent supersedes all prior understandings among the parties hereto. This Letter of Intent may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same Letter of Intent. Delivery of an executed counterpart signature page to this Letter of Intent by facsimile or e-mail shall be effective as delivery of a manually executed counterpart to

3

79514736.11

## RETRO CAPITAL GROUP, LLC

this Letter of Intent.  Only a writing executed by each of the parties may amend this Letter of Intent.

79514736.11

RETRO CAPITAL GROUP, LLC

If the foregoing constitutes a mutually satisfactory basis for proceeding and reflects our mutual agreement, please so indicate by signing and dating this Letter of Intent in the places indicated below and returning one fully executed copy to the undersigned.

Very truly yours,

Retro Capital Group, LLC

By:
Name: _Brad Bueck_
Title: _Partner_

Agreed to and accepted as of ___October 6___, 2021

Resurgence Behavioral Health, LLC

By: _____
Name:  Stephen Fennelly
Title:  Owner & Chief Executive Officer

Steven Fennelley

[SIGNATURE PAGE TO LETTER OF INTENT]

FILED: NEW YORK COUNTY CLERK 09/12/2022 05:40 PM    INDEX NO. 656511/2021

NYSCEF DOC. NO. 53    Case 1:23-cv-00803-ZNQ-JBD    Document 35-1    Filed 08/04/23    Page 60 of 115 PageID: 418    RECEIVED NYSCEF: 09/12/2022

RETRO CAPITAL GROUP, LLC

## Exhibit A

## TERM SHEET
## FOR PROPOSED ACQUISITION OF
## RESURGENCE BEHAVIORAL HEALTH, LLC AND AFFILIATES

**Form of Transaction**

Subject to completion of Buyer's legal due diligence, the Transaction will be structured as the purchase by Buyer of the Company's ownership interests and/or substantially all of the assets owned and/or used by the Company and its affiliates in the Resurgence Behavioral Health substance abuse treatment business, including with respect to operations in California, Tennessee and Texas. The transaction structure and terms will be consistent with the provisions of this Term Sheet and shall be at Buyer's discretion. Excluded from the Transaction would be (i) accounts receivable for services rendered by the Company prior to Closing; and (ii) other assets expressly excluded by Buyer. The affiliate-owned real estate assets would be subject to purchase and/or lease on terms that the parties will address as part of due diligence.

**Purchase Price**

The enterprise value of the Company for purposes of the Transaction is **$22.3 million** as adjusted per the terms hereof, and further assumes a cash-free/debt-free balance sheet, subject to due diligence (the "Purchase Price").

The Purchase Price will be paid in cash and shall be reduced by (i) all accrued but unpaid bonuses, PTO and severance or other obligations accrued or owing but unpaid as of the Closing that is payable to Company employees or affiliates; and (ii) all existing indebtedness and similar liabilities. The Purchase Price will be paid by Buyer as follows: (i) $1,000,000 to Seller at Closing; (ii) payment of the MCA or other debt to creditors thereof on terms satisfactory to Buyer at Closing; (iii) an additional $1,000,000 to Seller at the three-month anniversary of Closing; and (iv) the remaining net balance of the Purchase Price in six equal installments over the 7th-12th month anniversaries of Closing, subject to adjustment as reflected herein and Company and Seller compliance with the terms of the Purchase Agreement and all other transaction documents.

**Closing**

The parties shall use their best efforts to execute the Purchase Agreement and reach Closing by November 1, or as soon as possible. Closing would be subject to completion of Buyer's due

FILED: NEW YORK COUNTY CLERK 09/12/2022 05:40 PM INDEX NO. 656511/2021

NYSCEF DOC. NO. 53    Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 61 of 115 PageID: 419    RECEIVED NYSCEF: 09/12/2022

**RETRO CAPITAL GROUP, LLC**

diligence, receipt of any material approvals and other closing conditions that will be detailed in the Purchase Agreement.

**Closing Conditions/
Deliveries**

Closing will be contingent upon the satisfaction of customary conditions/deliverables, including, without limitation, (i) Buyer's reasonable satisfaction that the material licenses and payor relationships will remain intact (including via a management agreement), (ii) execution by Seller of a one-year services agreement to provide services to Buyer at a fair market value compensation level that will be agreeable to Buyer, (iii) execution by Seller of a non-competition/non-solicitation agreement during and for a period of one year from when Seller ceases providing services to Buyer, provided (x) Seller will continue to be allowed to operate the treatment program in Dallas, Texas as presently operated, or contemplated to be operated, as well as any program in a state other than California, Texas or Tennessee during this period and (y) Seller will have the right to operate the Option Programs as presently operated following any termination of the transaction with respect to such programs, as well as any other Programs in Texas or Tennessee that are reasonably approved by Buyer, (iv) execution or signing of employment agreements by one or more key employees to be identified by Buyer during its due diligence (to take effect at Closing), (v) absence of any material adverse change in the business, and (vi) material accuracy of all representations and warranties and other Seller-provided information relating to the Company.

**Additional Purchase
Agreement Matters**

The Purchase Agreement will provide that Buyer shall have the option, at any time before the six month anniversary of Closing, to terminate the transaction with respect to the Company's operations in Tennessee and Texas ("Option Programs") in exchange for a reduction in the Purchase Price of $3,800,000. Buyer may elect such termination at any time on written notice to Seller, and shall further be entitled to a deduction in the Purchase Price to account for any operating losses if less incurred from its period of ownership of the Option Programs. Prior to the effective date of any termination of the transaction as to the Option Programs, Buyer shall have the sole right and authority to operate and manage (including via third-party management company or an otherwise) the Option Programs. For the elimination of doubt, Buyer will have sole right to all revenue and accounts receivable from the Option Programs for dates of service prior to the effective date of any termination, but after the Closing Date of this Transaction, and

RETRO CAPITAL GROUP, LLC

shall convey the Option Programs back to Seller on an as-is / where-is basis.

**Indemnification Matters; Representations:** The Purchase Agreement shall contain representations, warranties and covenants by the Company and Seller as are customarily present in transactions of this type. Customary fundamental matters such as capitalization, organization, transaction authority, enforceability, brokers' fee issues, as well as regulatory and healthcare compliance and compliance with laws, will survive until the expiration of the applicable statutes of limitations, with other representations and warranties surviving until the third anniversary of Closing. Buyer shall be fully indemnified for any pre-closing liabilities, including any and all pre-Closing claims, litigation or regulatory matters, payor audits or recoupment claims, governmental investigation(s) and any and all matters relating to the Company's pre-closing operations, or the operations of the Option Programs prior to transfer of the Option Programs to Seller, with setoff rights and an appropriate escrow for such established based on results of Buyer's due diligence.

**Miscellaneous:** The Company shall obtain a tail insurance policy satisfactory to Buyer for any coverages that are presently written on a "claims made" basis at or prior to the Closing, with the cost of such tail insurance borne by Seller, as reasonably requested by Buyer.

Buyer, on the one hand, and Seller as provided above, on the other hand, will each be responsible for their own legal and other professional fees incurred in connection with the Transaction.

## EXHIBIT B

The Iruka UCC Lien Notice

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 64 of 115 PageID: 422

# LAW OFFICES OF ISAAC H. GREENFIELD PLLC

2 EXECUTIVE BLVD., STE. 305
SUFFERN, NEW YORK 10901

---

*Isaac H. Greenfield, Esq.*
*Managing Attorney*

*email: info@greenfieldlawpllc.com*
*Phone: (718) 564-6268*
*FAX: (516) 387-1117*

October 25, 2021

**Via Email and Fax:**
The Law Offices of Fransen & Molinaro, LLP
4160 Temescal Canyon Rd. #306
Corona, CA 92883

### UCC LIEN NOTICE AND NOTICE OF ASSIGNMENT OF ACCOUNTS-RECEIVABLE BY ASSIGNOR TO IRUKA CAPITAL GROUP LLC, AS ASSIGNEE

Re:     ***RESURGENCE CALIFORNIA LLC d/b/a RESURGENCE CALIFORNIA; ADVANCED RECOVERY SOLUTIONS, LLC; PEARL OF THE SEA RETREAT, LLC; A NEW START TREATMENT & RECOVERY, LLC D/B/A MUSE; THE WELL RECOVERY PARTNERS, INC.; BALBOA HORIZONS RECOVERY SERVICES INC.; COASTAL RECOVERY HEALTH & WELLNESS, INC; A PLUS C QUALITY CONSTRUCTION LLC; COASTAL RECOVERY, INC; COMMISSIONS EARLY, LLC; BETTER SOUL INC***
***EIN: 84-1410017; 81-0955021; 32-0583713; 38-3900926; 81-2187644; 45-4245810; 81-4769314; 85-1577191***

        ***Balance due to IC: $331,460.22***

To Whom It May Concern,

        I am the managing attorney for Law Offices of Isaac H. Greenfield PLLC, the firm retained by IRUKA CAPITAL GROUP LLC ("IC"). This notice is being sent pursuant to UCC 9-406 as it has come to our attention that The Law Offices of Fransen & Molinaro, LLP ("Account Debtor") is an account debtor  (as defined by the Uniform Commercial Code) of RESURGENCE CALIFORNIA LLC d/b/a RESURGENCE CALIFORNIA; ADVANCED RECOVERY SOLUTIONS, LLC; PEARL OF THE SEA RETREAT, LLC; A NEW START TREATMENT & RECOVERY, LLC D/B/A MUSE; THE WELL RECOVERY PARTNERS, INC.; BALBOA HORIZONS RECOVERY SERVICES INC.; COASTAL RECOVERY HEALTH & WELLNESS, INC; A PLUS C QUALITY CONSTRUCTION LLC; COASTAL RECOVERY, INC; COMMISSIONS EARLY, LLC; BETTER SOUL INC (the "Merchant"), located at 3151 AIRWAY AVE, STE E1 , COSTA MESA, CA 92626.

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 65 of 115 PageID: 423

Please be advised that the Merchant has defaulted on a secured merchant agreement entered into by and between the Merchant and IC on December 31, 2021, a copy of which is enclosed herein for your reference (the "Agreement"). The balance currently due and owing to IC pursuant to the Agreement is $331,460.22.

Pursuant to the Agreement, IC purchased $1,993,575.00 of the Merchant's future accounts-receivable for the purchase price of $1,425,000.00. The Agreement was structured so that IC was to receive a percentage of all of the Merchant's receivables. In accordance with the Agreement, IC filed a UCC-1 financing statement with the Secretary of State of CA, thereby obtaining a perfected security interest in the Merchant's assets, including without limitation the Merchant's accounts-receivable. A copy of the UCC-1 is also enclosed herein for your reference.

It has come to IC's attention that Account Debtor is in possession of receivables due and owing to the Merchant, constituting "Accounts" as defined by the Uniform Commercial Code. While it is understood that Account Debtor has an agreement with the Merchant and not IC, this letter is nonetheless being sent to instruct Account Debtor in accordance with UCC 9-406, to immediately forward all funds, that would be payable to the Merchant, to my office until the amount of $331,460.22 accrues. I am confident that once the above-requested action is taken by Account Debtor, in addition to mitigating the risk to Account Debtor with respect to converting the funds in which IC has a secured interest, this matter will be quickly resolved.

Thank you for your prompt attention to this matter, and please don't hesitate to reach out with any questions or concerns regarding the above, I can be reached at (718) 564-6268.

Sincerely,

**Law Offices of Isaac H. Greenfield PLLC**

By:_____

Isaac H. Greenfield, Esq.

U210023708524



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210023708524

Date Filed: 2/12/2021

Submitter Information:

| | |
|---|---|
| Contact Name | Alex Englard |
| Organization Name | INTERSTATE FILINGS |
| Phone Number | (718) 569-2703 |
| Email Address | orders@interstatefilings.com |
| Address | 301 MILL ROAD SUITE U-5 HEWLETT, NY 11557 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| RESURGENCE CALIFORNIA LLC | 3151 AIRWAY AVE STE E1 COSTMA MESA, CA 92626 |
| STEPHEN JAMES FENNELLY | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| ADVANCED RECOVERY SOLUTIONS, LLC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| PEARL OF THE SEA RETREAT, LLC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| A NEW START TREATMENT & RECOVERY, LLC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| MUSE | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| THE WELL RECOVERY PARTNERS, INC. | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| BALBOA HORIZONS RECOVERY SERVICES INC. | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| COASTAL RECOVERY HEALTH & WELLNESS, INC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| A PLUS C QUALITY CONSTRUCTIONS LLC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| COASTAL RECOVERY, INC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |
| COMMISSIONS EARLY, LLC | 3151 AIRWAY AVE STE E1 COSTA MESA, CA 92626 |

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 67 of 115 PageID: 425

| BETTER SOUL INC | 3151 AIRWAY AVE<br>STE E1<br>COSTA MESA, CA 92626 |
|---|---|

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| IRUKA CAPITAL GROUP LLC | 162 ELMORA AVE<br>#211<br>ELIZABETH, NJ 07202 |

Indicate how documentation of Collateral is provided:

Entered as Text

Description:

ACCOUNTS RECEIVABLE, CASH, CASH PROCEEDS, ACCOUNTS, CHATTEL PAPER, EQUIPMENT, GENERAL INTANGIBLES, INVENTORY, INSTRUMENTS RELATED TO THE RECEIPTS, INSTRUMENTS RELATED TO THE FUTURE RECEIVABLES.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:

Not Applicable

Select an alternate Financing Statement type:

Not Applicable

Select an additional alternate Financing Statement type:

Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Not Applicable

Optional Filer Reference Information:

Miscellaneous Information:

Search to Reflect:

☐ Order a Search to Reflect

00370-1362 02/12/2021 7:58 AM Received by California Secretary of State

# IRUKA CAPITAL GROUP LLC

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated __12/31/2020_____, between Iruka Capital Group LLC ("Buyer") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

**Business Legal Name:** RESURGENCE CALIFORNIA LLC, and the entities listed on "Exhibit B"
**D/B/A:** RESURGENCE CALIFORNIA, and the entities listed on "Exhibit B"
**Form of Business Entity:** LLC                    **EIN #:** 84-1410017
**Physical Address:** 3151 AIRWAY AVE STE E1, COSTA MESA, CA 92626
**Mailing Address:** 3151 AIRWAY AVE STE E1, COSTA MESA, CA 92626

| PURCHASE PRICE: | PURCHASED AMOUNT: | SPECIFIED PERCENTAGE: | INITIAL INSTALLMENT: |
|---|---|---|---|
| $ 1,425,000.00 | $ 1,993,575.00 | 17% | $ 19,935.75 per day |

| FOR SELLER #1 | FOR SELLER # 2 (if any) |
|---|---|
| By: STEPHEN JAMES FENNELLY (DocuSigned by: 731BB0136470423...) | By: _____ |
| **Name:** STEPHEN JAMES FENNELLY | **Name:** _____ |
| **Title:** Owner/Agent/Manager | **Title:** Owner/Agent/Manager |
| **Email:** steve.fennelly@resurgencebh.com | **Email:** _____ |
| **Business Phone:** _____ | **Business Phone:** _____ |

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as Exhibit A (the "Guaranty") to be signed and delivered to Buyer.

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign a standard form addendum of Buyer to this Agreement reflecting said interest of Buyer.

**WHEREAS**, Seller is desirous to sell to Buyer, and Buyer is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Buyer and Seller hereby agree to the foregoing and as follows:

1.    **Basic Terms and Definitions**.

        **a.**    "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when BUYER paid the Purchase Price to Seller.

        **b.**    "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of each and every sum from sale made by Seller of Future Receipts.

        **c.**    "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller. "Daily Receipts" shall mean the amount of Future Receipts received by Seller on a daily basis.

        **d.**    "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to Buyer pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

Page 1 of 22

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 69 of 115 PageID: 427

**e.** "Purchase Price" shall mean the total amount that Buyer agrees to pay for the Purchased Amount. The Purchase Price shall be the amount set forth under "Purchase Price" in the preamble to this Agreement. However, the amount that Seller will actually receive from Buyer pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs h., i., and j. below.

**f.** "Initial Installment" shall mean the fixed amount (whether daily or weekly, as set forth in the preamble) that Seller and Buyer agree to be a good faith approximation of the Specified Percentage of Seller's (daily or weekly) Future Receipts. Seller and Buyer further agree that the Initial Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Buyer concerning Seller's most recent accounts receivables and/or revenue, including representations by the Seller to Buyer regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

**g.** "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

**h.** "Applicable Fees" shall mean, collectively, all initial costs and fees that Seller agrees to pay to Buyer as consideration for agreeing to enter into this Agreement and that are described in Section 17 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 1 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

**i.** "Prior Balance" shall mean the sum of all amounts that Seller may owe to Buyer and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

**j.** "Origination Fee" shall mean the fee set forth in Rider 1 that Buyer charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

**k.** In the event "Seller" is comprised of more than one entity, then:

    **i.** The term "Seller" shall mean, individually and collectively, all such entities; and

    **ii.** Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

    **iii.** The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement;

    **iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity;

    **v.** The terms "Specified Percentage", "Future Receipts", and "Initial Installment" shall mean the Specified Percentage and the Future Receipts of each Seller individually; and

    **vi.** Buyer may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

**l.** In the event "Guarantor" is comprised of more than one individual, then:

    **i.** The term "Guarantor" shall mean, individually and collectively, all such individuals;

    **ii.** Each Guarantor is an Affiliate of all other Guarantor(s);

    **iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty;

**iv.** The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** Buyer may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2. The Term**. This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, and therefore it is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to Buyer pursuant to this Agreement are received by Buyer in full.

**3. Sale of Purchased Future Receipts**. Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto Buyer all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Buyer (hereinafter, the portion of the Future Receipts sold by Seller to Buyer pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto Buyer, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Buyer of collectability of the Purchased Future Receipts by Buyer and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4. Payment of Purchase Price**. In consideration of the sale by Seller to Buyer of the Purchased Future Receipts pursuant to this Agreement, Buyer agrees to pay to Seller the Purchase Price. The amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5. Use of Purchase Price**. Seller hereby acknowledges that it fully understands that: (i) Buyer's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Buyer in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Buyer's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the foregoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6. Initial Installments of Purchased Amount**. The Purchased Amount shall be delivered by Seller to Buyer in the amount of the Initial Installment on each and every Workday or Workweek (depending on whether the Initial Installment are daily or weekly) commencing on the Effective Date and ending on the Expiration Date.

**7. Approved Bank Account and Credit Card Processor.** During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by Buyer (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Buyer (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8. Authorization to Debit Approved Bank Account**. Seller hereby authorizes Buyer to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the Initial Installment commencing on the Effective Date until Buyer receives the full Purchased Amount;

*Seller shall provide Buyer with all access code(s) for the Approved Bank Account during the Term of this Agreement.

The Initial Installment is to be drawn via ACH payment, from the following bank account:

**i.** Account Number: ███████
**ii.** Routing Number: ███████
**iii.** Account Name: ███████
**iv.** Bank Name: ███████

*Note that this authorization is to remain in full force and effect until Buyer receives written notification from

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 71 of 115 PageID: 429

Seller of its termination in such time and in such manner to afford Buyer a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

**9.**   **Fees Associated with Debiting Approved Bank Account**. It shall be Seller's exclusive responsibility to pay to its banking institution and/or Buyer's banking institution directly (or to compensate Buyer, in case it is charged) all fees, charges and expenses incurred by either Seller or Buyer due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

**10.**   **Seller's Right for Reconciliation**. Seller and Buyer each acknowledges and agrees that:

**a.**   If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by Buyer (each such calendar month, a "Reconciliation Month").

**b.**   Such reconciliation (the "Reconciliation") of the Seller's Initial Installment for a Reconciliation Month shall be performed by Buyer within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Buyer from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

**c.**   One or more Reconciliation procedures performed by Buyer may reduce or increase the effective Initial Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Buyer will be debiting the Approved Bank Account may get shortened or extended indefinitely.

**11.**   **Request for Reconciliation Procedure.**

**a.**   It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Installments during any Reconciliation Month by sending a request for Reconciliation to Buyer.

**b.**   Any such request for Reconciliation of the Seller's Initial Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements, and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by ICG via email to reconciliation@irukacapital.com, with the subject line "REQUEST FO RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by Buyer).

**c.**   Buyer's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

**d.**   Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Buyer shall comply with each such request, provided that:

**i.**   Each such request is made in accordance with the terms of this Section 11; and

**ii.**   If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Buyer from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

**e.**   Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Buyer's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Buyer in full, or (ii) modify the amount of the Initial Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

**12.**   **Adjustment of the Initial Installment**. Seller and Buyer each acknowledge and agree that:

**a.**   If at any time during the term of this Agreement Seller experiences a steady decrease in its Receipts,

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 72 of 115 PageID: 430

Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Installment that Seller is obligated to deliver to Buyer in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Installment (the "Adjusted Installment") shall replace and supersede the amount of the Initial Installment set forth in Section 1 above.

    **b.**    The Adjustment of the Initial Installment shall be performed by Buyer within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

    **c.**    One or more Adjustments performed by Buyer may substantially extend the term of this Agreement.

## 13.  Request for Adjustment Procedure.

    **a.**    It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to Buyer.

    **b.**    A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account, the last three (3) credit card processing statements and the last three (3) aging reports immediately preceding the date of Buyer's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to Buyer based upon which statements the amount of the Initial Installment set forth in Section 1 above (or the then current Adjusted Installment as the case may be) was determined, and shall be received by Buyer by email at reconciliation@irukacapital.com, with the subject line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by Buyer).

    **c.**    Buyer's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

    **d.**    Seller shall have the right to request Adjustment of the Initial Installment, or the Adjusted Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and Buyer shall comply in good faith with such request, provided that:

        **i.** Each such request for Adjustment is made in accordance with the terms of this Section 13; and

        **ii.** A request for Adjustment shall not be made after the Expiration Date.

    **e.**    Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with Buyer's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by Buyer in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

## 14.  Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").

    **a.**    Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from Buyer of the Purchase Price, and upon obtaining Buyer's prior written consent, to accelerate delivery to Buyer of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "Outstanding PAFR"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

    **b.**    The Outstanding PAFR can only be delivered in full and not partially.

    **c.**    Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying Buyer to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

    **d.**    Buyer shall respond to Seller's request within three (3) Workdays from the date of its receipt by Buyer.

Case 1:23-cv-00803-ZNQ-JBD Document 35-1 Filed 08/04/23 Page 73 of 115 PageID: 431

**e.** In its response to Seller's request, Buyer shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

**f.** As of the date agreed upon as between Buyer and Seller, Seller shall deliver to Buyer the full amount of the Outstanding PAFR (such date, the "Accelerated Delivery Date").

**g.** Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to Buyer of the Initial Installments prior to the delivery of the Outstanding PAFR to Buyer.

**h.** Upon delivery of the Outstanding PAFR to Buyer in compliance with the provisions of this Section 14, Seller's obligations to Buyer pursuant to this Agreement shall be deemed completed and fulfilled.

**15.** **Rights and Obligations of Buyer Upon Receipt of the Outstanding PAFR**. Upon receipt of the full amount of the Outstanding PAFR:

**a.** Buyer shall notify the Approved Bank Account and request from it to stop transferring Initial Installments to Buyer's bank account.

**b.** If Buyer shall have received one or more Initial Installment (or Adjusted Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing Buyer's request described in subparagraph (a) above or for any other reason), Buyer shall immediately do one of the two following things (but not both):

**i.** Return to Seller the total sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by Buyer after the date of delivery of the Outstanding PAFR to Buyer; or

**ii.** Apply the total sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by Buyer after the Accelerated Delivery Date toward Seller's outstanding financial obligations to Buyer existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

**A.** By way of example, if as of the Accelerated Delivery Date, Seller and Buyer would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "Unrelated Future Agreement"), then and in such event Buyer may, in its sole and absolute discretion, apply the sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by Buyer after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to Buyer pursuant to the Unrelated Future Agreement.

**c.** Seller acknowledges and agrees that Buyer shall have the right to apply the total sum of the Initial Installments (or Adjusted Installments, as the case may be) received by Buyer after the Accelerated Delivery Date toward Seller's outstanding financial obligations to Buyer existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, Buyer granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

**16.** **Risk Sharing Acknowledgments and Arrangements**.

**a.** Seller and Buyer each hereby acknowledges and agrees that:

**i.** The Purchased Future Receipts represent a portion of Seller's Future Receipts.

**ii.** This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Buyer. Buyer does not charge Seller and will not collect from Seller any interest on the monies used by Buyer for the purchase of the Purchased Future Receipts. The period of time that it will take Buyer to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after Buyer's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, Buyer may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

**iii.** The amount of the Initial Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to Buyer.

**iv.** The amounts of Seller's Future Receipts may increase or decrease over time.

**v.** If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be

---

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 74 of 115 PageID: 432

determined that the actual amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

      **b.**    <u>Buyer's Risk Acknowledgments</u>. Buyer agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, Buyer hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "<u>Valid Excuses</u>"):

      **i.**    adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

      **ii.**    loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

      **iii.**    bankruptcy of Seller; and/or

      **iv.**    natural disasters or similar occurrences beyond Seller's control.

      **c.**    <u>Application of Amounts Received by Buyer</u>. Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

      **d.**    <u>Not a Loan</u>. Seller and Buyer agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by BUYER is not intended to be, nor shall it be construed as, a loan from Buyer to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, Buyer's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to Buyer in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that Buyer has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by Buyer shall automatically be reduced to the maximum rate permitted by applicable law and Buyer shall promptly refund to Seller any interest received by Buyer in excess of the maximum lawful rate.

**17.**    <u>Applicable Fees</u>. Seller acknowledges that the Applicable Fees were agreed upon between Seller and Buyer prior to Seller entering into this Agreement, were subject to arm-length negotiation between Buyer and Seller, and a detailed list of the Applicable Fees is set forth in Rider 1 of this Agreement, which is attached hereto and made a part hereof.

**18.**    <u>Prior Balance</u>. Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of such representation being untrue, incorrect or incomplete.

**19.**    <u>Origination Fee</u>. Seller hereby agrees for Buyer to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

**20.**    <u>No Reduction of Purchase Price</u>. Seller hereby: (i) agrees to pay the Applicable Fees, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Closing Costs from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

FILED: NEW YORK COUNTY CLERK 09/16/2022 09:45 PM        INDEX NO. 656511/2021
NYSCEF DOC. NO. 90                                      RECEIVED NYSCEF: 09/16/2022

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**21.**     Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

**a.**     <u>Financial Condition and Financial Information</u>. Seller's bank and financial statements, copies of which have been furnished to Buyer, and future statements which may be furnished hereafter pursuant to this Agreement or upon Buyer's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise Buyer of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. Buyer may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to Buyer within two (2) Workdays of such request. Seller's failure to do so, and/or cutting off Buyer's online access to the Approved Bank Account, is a material breach of this Agreement.

**b.**     <u>Governmental Approvals</u>. Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**c.**     <u>Good Standing</u>. Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

**d.**     <u>Authorization</u>. Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

**e.**     <u>Accounting Records and Tax Returns</u>. Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Buyer is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

**f.**     <u>Taxes; Workers Compensation Insurance.</u> Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

**g.**     <u>Business Insurance</u>. Seller maintains and will maintain general liability and business-interruption insurance naming Buyer as loss payee and additional insured in the amounts and against risks as are satisfactory to Buyer and shall provide Buyer proof of such insurance upon request.

**h.**     <u>Electronic Check Processing Agreement</u>. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Buyer's rights under this Agreement, without Buyer's prior written consent.

**i.**     <u>No Diversion of Future Receipts</u>. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Buyer's written permission.

**j.**     <u>Change of Name or Location</u>. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Buyer, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Buyer's written consent.

**k.**     <u>Prohibited Business Transactions.</u> Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining Buyer's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**l.**     <u>No Closing of Business</u>. Seller will not sell, dispose, transfer or otherwise convey all or substantially all

FILED: NEW YORK COUNTY CLERK 09/16/2022 09:45 PM INDEX NO. 656511/2021
NYSCEF DOC. NO. 56 RECEIVED NYSCEF: 09/16/2022

of its business or assets without first: (i) obtaining the express written consent of Buyer, and (ii) providing Buyer with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Buyer shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Buyer ten (10) business days advance notice.

**m.** **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under any title of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n.** **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) day's prior notice from Buyer to Seller, execute, acknowledge and deliver to Buyer and/or to any other person or entity specified by Buyer, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

**o.** **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**p.** **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of Buyer. Any further encumbrance by seller of the Future Receipts is a material breach of this Agreement.

**q.** **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**r.** **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**s.** **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Buyer the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Buyer and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide Buyer, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Buyer to interview any of those parties.

**t.** **Phone Recordings and Contact.** Seller agrees that any call between Seller and Buyer and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Buyer, its managers, employees and agents (collectively, the "Buyer Parties") and that Seller may be contacted by any of the Buyer Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the Buyer Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

**u.** **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 77 of 115 PageID: 435

by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

      **v.**   **Seller's Due Diligence**. The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Buyer.

      **w.**   **Consultation with Counsel**. The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

      **x.**   **Buyer's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining Buyer's consent, such consent may be withheld, granted or conditioned at Buyer's sole and absolute discretion.

      **y.**   **No Reliance on Oral Representations**. This Agreement contains the entire agreement between Seller and Buyer with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by Buyer or any of the Buyer Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Buyer Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

      **z.**   **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Closing Costs, if any, Buyer is not charging any additional fees to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in this Agreement or the Riders hereto, such fee is not charged by Buyer. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

## PLEDGE OF SECURITY

**22.**   **Pledge**. As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the **"**Obligations**"**), Seller hereby pledges, assigns and hypothecates to Buyer (collectively, "Pledge") and grants to Buyer a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the **"**Collateral**"**), whether now existing or hereafter from time to time acquired:

      **a.**   all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

      **b.**   all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23.**   **Termination of Pledge**. Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Buyer will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24.**   **Representations with Respect to Collateral**. Seller hereby represents and warrants to Buyer that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC -1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 78 of 115 PageID: 436

25.     **Further Assurances**. Upon the request of Buyer, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Buyer may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

26.     **Attorney-in-Fact**. Seller hereby authorizes Buyer at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Buyer as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in Buyer's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse and collect all instruments made payable to Seller.

## EVENTS OF DEFAULT AND REMEDIES

27.     **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    **a.**     Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Installments (or Adjusted Installments, as the case may be) to Buyer, and timely and in full payment to Buyer of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

    **b.**     Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.**     Seller shall default under any of the terms, covenants and conditions of any other agreement with Buyer (if any) which is related to the instant Agreement.

    **d.**     Seller uses multiple depository accounts without obtaining prior written consent of Buyer in each instance.

    **e.**     Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.**     Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of BUYER in each instance.

    **g.**     Seller interferes with Buyer's collection of Initial Installments (or Adjusted Installments, as the case may be).

    **h.**     Two (2) or more ACH transactions attempted by Buyer are rejected by Seller's bank due to lack of sufficient funds in the Approved Bank Account, without Seller giving Buyer prior notice and a valid reason for said lack of funds.

    **i.**     Buyer receives an "R02", "R07", "R08", "R16", "R29" or any other similar ACH response code indicating that Buyer's ACH transactions have been stopped, not authorized, or the account has been frozen or closed and Buyer has not been given proper notice and reason for said response code.

    **j.**     The Guaranty shall for any reason cease to be in full force and effect.

28.     **Default under the Agreement**. In case any Event of Default occurs and is not waived by Buyer, in writing, Buyer may declare Seller in default under this Agreement without notice.

29.     **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Buyer the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to Buyer, as additional damages, any reasonable expenses incurred by Buyer in connection with recovering the monies due to Buyer from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that Buyer shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as thirty-three percent (33%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or seventy-five hundred dollars ($7,500.00), whichever is greater. The entire sum due to Buyer pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 9.00% per annum (and such interest shall accrue daily).

30.     **Remedies Upon Default**. Upon Seller's default, Buyer may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 79 of 115 PageID: 437

     **a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller and/or Guarantor(s) as the terms are defined below, of Buyer's security interest (Buyer understands that in the course of notifying said account debtor of Seller's security interest, Seller shall have the right to share any and all information regarding this Agreement and the Personal Guarantee of Performance);

     **b.** Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

     **c.** Notifying Seller's and/or Guarantor's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Buyer of all or any portion of the amounts received by such credit card processor on behalf of Seller; and

     **d.** Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Buyer's rights of a secured party under the UCC.

**31.**   <u>**Remedies are not Exclusive**</u>. All rights, powers and remedies of Buyer in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Buyer by law or equity.

**32.**   <u>**Power of Attorney**</u>. Seller irrevocably appoints Buyer and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Buyer from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code (" <u>Account Debtors</u>"), to make payment directly to Buyer (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount.

**ADDITIONAL TERMS**

**33.**   <u>**Seller Deposit Agreement**</u>. Seller shall execute an agreement with Buyer that shall authorize Buyer to arrange for electronic fund transfer services and/or "ACH" payments of Initial Installments (or Adjusted Installments, as the case may be) from the Approved Bank Account. Seller shall provide Buyer and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) Buyer and/or it's agent to deduct daily the amounts of the Initial Installment (or the Adjusted Installment, as the case may be) to Buyer from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to Buyer by permitting Buyer to withdraw the Initial Installments (or the Adjusted Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34.**   <u>**Financial Condition**</u>. Seller and its Guarantor(s) authorize Buyer and its agents to investigate their financial status and history and will provide to Buyer any bank or financial statements, tax returns, etc., as Buyer deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. Buyer Seller hereby authorizes Buyer to receive from time to time updates on such information and financial status.

**35.**   <u>**Transactional History**</u>. Seller shall execute written authorization(s) to their bank(s) to provide Buyer with Seller's banking and/or credit-card processing history.

**36.**   <u>**Indemnification**</u>. Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by Buyer for monies owed to Buyer from Seller and (b) actions taken by any ACH processor,

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 80 of 115 PageID: 438

customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Buyer.

**37.**   **No Liability**. In no event shall Buyer be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

**38.**   **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this  Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39.**   **Assignment**. Buyer may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Buyer's written consent.

**40.**   **Notices**. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) business day after being sent to the recipient by recognized overnight courier service, or (c) three (3) business days after being mailed to the recipient by certified, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth in the preamble of this Agreement.

**41.**   **Waiver Remedies**. No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**42.**   **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**43.**   **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Seller consents to the jurisdiction of the federal and state courts located in the State of New York, including but not limited to the County of Kings and agrees that (subject to Section 49 of this Agreement) such courts shall be the exclusive forum for all actions, proceedings or litigation arising out of or relating to this Agreement or subject matter thereof ("Dispute"), notwithstanding that other courts may have jurisdiction over the parties and the subject matter, and the parties waive any forum non conveniens or other objection to such jurisdiction and venue. Purchaser may serve Seller with legal process for any Dispute via certified mail by mailing same to Seller's address set forth herein or Seller's current or last known address at the time of suit, and upon such mailing, service shall be proper irrespective of whether a signed certified mail return receipt is retuned to Purchaser.

**44.**   **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

**45.**   **Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**46.**   **Entire Agreement**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s), Riders and Addendums, if any, to this Agreement are part of this Agreement.

**47.**   **JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY  AND  VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**48.**   **CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS  AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE**

Case 1:23-cv-00803-ZNQ-JBD    Document 35-1    Filed 08/04/23    Page 81 of 115 PageID: 439

ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

49.    **ARBITRATION**. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH BUYER, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

50.    **Counterparts and Facsimile Signatures**. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

## [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Case 1:23-cv-00803-ZNQ-JBD    Document 35-1    Filed 08/04/23    Page 82 of 115 PageID: 440

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER # 1**                                 **FOR THE SELLER # 2 (if any)**

By: _STEPHEN JAMES FENNELLY_                       By:_____
**Name:** STEPHEN JAMES FENNELLY                   **Name:**
**Title: Owner/Agent/Manager**                     **Title: Owner/Agent/Manager**
**EIN:** 84-1410017                                **EIN:** 84-1410017

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**                             **OWNER/GUARANTOR # 2 (if any)**

By: _STEPHEN JAMES FENNELLY_                        By:_____
**Name:** STEPHEN JAMES FENNELLY                    **Name:**
**SSN:** ███████                                    **SSN:**

**IRUKA CAPITAL GROUP LLC**

By: _____
**Name: JORDAN GREENMAN**
**Title: AUTHORIZED AGENT**

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 83 of 115 PageID: 441

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>12/31/2020</u>, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "<u>Guarantor</u>") for the benefit of **Iruka Capital Group LLC** ("<u>Buyer</u>").

**WHEREAS:**

**A.** Pursuant to that Future Receivables Sale and Purchase Agreement (the "<u>Agreement</u>"), dated as of <u>12/31/2020</u>, between Buyer and the Seller(s) listed below (collectively and individually, "<u>Seller</u>"), Buyer has purchased a portion of Future Receipts of Seller.

**B.** Each Guarantor is an owner, officer, manager or affiliate of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

**C.** Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "<u>Obligation</u>" and all such obligations, collectively, the "<u>Obligations</u>").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    **a.** any amendment, modification or extension of the Agreement or any Obligation;

    **b.** any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    **c.** any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    **d.** any other guaranty now or hereafter executed by Guarantor or anyone else;

    **e.** any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    **f.** any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    **g.** the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    **h.** the failure to give Guarantor any notice whatsoever;

      i.   any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Seller to Buyer. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forum"). The parties agree that the Acceptable Forum is convenient and submit to the jurisdiction of the Acceptable Forum and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to the Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in the Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this Guaranty.

**8. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**9. CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE**

Case 1:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 85 of 115 PageID: 443

THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

10. **ARBITRATION.** THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

11. **Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

12. **Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had had a reasonable opportunity to –and to the extent he or she wishes did– consult with his or her attorney. Guarantor understands the contents of this Guaranty and signs this Guaranty as his or her free act and deed.

13. **Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

AGREED AND ACCEPTED:

**OWNER/GUARANTOR #1**                              **OWNER/GUARANTOR #2 (if any)**

By: STEPHEN JAMES FENNELLY                          By:_____
Name:STEPHEN JAMES FENNELLY                         Name:
SSN: ██████                                         SSN:

**IRUKA CAPITAL GROUP LLC**

By: _____
Name: JORDAN GREENMAN
Title: AUTHORIZED AGENT

# EXHIBIT B

## LIST OF ADDITIONAL PARTIES IN WHOSE ASSETS SELLER HAS GRANTED BUYER A BLANKET SECURITY INTEREST:

**ADVANCED RECOVERY SOLUTIONS, LLC**
EIN#: 81-0955021

**PEARL OF THE SEA RETREAT, LLC**
EIN#: 32-0583713

**A NEW START TREATMENT & RECOVERY, LLC D/B/A MUSE**
EIN#: 38-3900926

**THE WELL RECOVERY PARTNERS, INC.**
EIN#: 81-2187644

**BALBOA HORIZONS RECOVERY SERVICES INC.**
EIN#: 45-4245810

**COASTAL RECOVERY HEALTH & WELLNESS, INC**
EIN#: 81-4769314

**A PLUS C QUALITY CONSTRUCTION LLC**
EIN#: N/A

**COASTAL RECOVERY, INC**
EIN#: N/A

**COMMISSIONS EARLY, LLC**
EIN#: 851577191

**BETTER SOUL INC**
EIN#: N/A

Buyer may file a UCC-1 financing statement with the appropriate Secretary of State(s) reflecting a blanket security interest in the assets of the above-listed entities.

Dated: 12/31/2020

*STEPHEN JAMES FENNELLY*
731BB0136470423...

STEPHEN JAMES FENNELLY

**EXHIBIT C**

**The Summons and Verified Complaint in the Merchant Capital Lawsuit**



# Ontario County Clerk Recording Page

**Return To**

ARIEL BOUSKILA
80 Broad St
Suite 3303
New York, NY 10004

**Matthew J. Hoose, County Clerk**
Ontario County Clerk
20 Ontario Street
Canandaigua, New York 14424
(585) 396-4200

Document Type: **SUMMONS + COMPLAINT**

Receipt Number: 575025

| Plaintiff |
|---|
| MERCHANT CAPITAL |

| Defendant |
|---|
| RESURGENCE CALIFORNIA LLC |

| Fees |
|---|

| Total Fees Paid: | $0.00 |
|---|---|

| Control #: | 202110260199 |
|---|---|
| Index #: | 130964-2021 |

State of New York
County of Ontario

EFiling through NYSCEF with a total page count of **9**.

*Matthew J Hoose*

**Ontario County Clerk**

*This sheet constitutes the Clerk's endorsement required by section 319 of the Real Property Law of the State of New York*

PK

**Do Not Detach**

# EXHIBIT C

## RETRO CAPITAL GROUP, LLC

October 4, 2021

Steve Fennelley
Founder and Chief Executive Officer
Resurgence Behavioral Health, LLC
3151 Airway Avenue E1
Costa Mesa CA 92626

### RE: Offer to Acquire Resurgence Behavioral Health, LLC

Dear Steve,

Pursuant to our recent conversations and past meetings and based upon the information received to date, Retro Capital Group, LLC or an affiliate ("Buyer" or "Retro") is pleased to put forth this acquisition proposal (the "Transaction") and letter of intent ("Letter of Intent") to acquire Resurgence Behavioral Health, LLC and its affiliated companies that operate substance abuse treatment programs in California, Tennessee and Texas ("Resurgence" or the "Company").

Our proposal reflects an aggregate **$22.3 million enterprise valuation** based upon a cash free/debt-free balance sheet. The foregoing enterprise value is inclusive of any positive tax attributes. The Purchase Price shall be paid as described in the Term Sheet attached as Exhibit A hereto (the "Term Sheet"). The Purchase Price shall be paid net of: (i) all Seller (as defined below) and Company-related Transaction fees and expenses, (ii) all accrued but unpaid management bonuses and severance as of the Closing that is payable to former employees, and (iii) all existing indebtedness, liabilities or obligations (including accounts payable and current liabilities) of the Company and its affiliates that encumber or relate to the Company or its assets.

We are committed to an expeditious due diligence process, subject to timely responses to our and our advisors' due diligence requests. In parallel with our due diligence, the Company, the owner of the Company ("Seller") and Buyer will enter into a definitive purchase agreement (the "Purchase Agreement") which shall reflect terms outlined in the Term Sheet, and which would be subject to our due diligence and customary conditions to Closing, including material third party approvals and consents.

Our due diligence shall include the following performed by diligence partners selected by Buyer:

a) Accounting/quality of earnings/audit/tax review;
b) Legal diligence including Company capital structure, indebtedness and liabilities;
c) Healthcare regulatory & legal diligence;
d) Compliance diligence; and
e) Management background checks.

1. Term Sheet. Based on our current understanding of the Company, we anticipate the Transaction would be on the terms summarized in the attached Term Sheet.

79514736.11

## RETRO CAPITAL GROUP, LLC

2.    <u>Access to Information</u>.  The Company and Seller shall promptly furnish to Buyer (and its financial and professional advisors, lenders and lenders' representatives, and permit Buyer (and its advisors, lenders and representatives) all requested due diligence information, and shall provide unrestricted access to such information, materials and personnel as may be reasonably necessary or advisable to allow the completion of financial, business, regulatory and legal diligence with respect to the Company.

3.    <u>Public Disclosures</u>.  The parties shall consult with one another and must agree in writing in advance concerning the form and substance of any press release or other public disclosure of the matters covered by this Letter of Intent, and shall make a diligent effort to prohibit their respective representatives from granting press interviews or engaging in similar actions that would result in public disclosure of such matters; <u>provided</u>, <u>however</u>, that these obligations shall not be deemed to prohibit any party from making any disclosure which such party deems reasonably necessary in order to fulfill such party's disclosure obligations imposed by law.

4.    <u>Conduct of Business</u>.  During the Exclusivity Period (as defined below), the Company shall, and Seller shall cause the Company and its subsidiaries and affiliates, to: (i) conduct their respective businesses in a reasonable and prudent manner in accordance with past practices, including hiring and terminating personnel, (ii) preserve their existing business organizations and relations with their employees, customers, suppliers and others with whom they have a business relationship in the ordinary course of business, (iii) preserve and protect their programs and properties and conduct their business in compliance with all applicable laws and regulations, (iv) maintain compliance with applicable laws, regulations and contractual obligations, (v) refrain from incurring any additional debt or liabilities or transferring any of their business assets to any third party or affiliated party and (vi) promptly notify Buyer of any material change or event that may reasonably be material to the Company, its operations or assets or the Transaction.

5.    <u>Exclusivity</u>.  During the period commencing upon the parties' execution of this Letter of Intent and extending **through November 4, 2021** (the "<u>Exclusivity Period</u>"), the Company and Seller (i) agree to deal, directly and indirectly, exclusively with Buyer regarding the acquisition of the Company and/or its assets; (ii) agree not to, and agree to cause their respective officers, directors, partners, stockholders, members, employees, principals, agents, representatives and advisors ("<u>Representatives</u>") not to, directly or indirectly, solicit, negotiate, participate in or continue or have any discussion, or enter into any agreements, arrangements or understandings, with any person or entity relating to any sale by Seller of equity interests in, or any merger or sale of securities or substantial assets of, the Company or any of its subsidiaries (including any transfer of business assets to any third party of affiliated party, or (with the exception of factoring any Accounts Receivables for services rendered prior to Closing, or obtaining credit for the purpose of servicing or paying off existing debt) any recapitalization or financing (including incurring any additional debt or liabilities), investment or public offering transaction, or any similar transaction or alternative to any of the foregoing that conflicts with or defeats the purposes of this Letter of Intent, and (iii) agree not to, and agree to cause their respective Representatives not to, encourage any third party to initiate any action to accomplish or facilitate any of the foregoing. The Company and Seller shall promptly terminate all discussions with respect to transactions involving any of

2

79514736.11

## RETRO CAPITAL GROUP, LLC

the foregoing involving the Company other than with Buyer and shall promptly inform Buyer of any offer, indication of interest or proposal hereafter received from any third party, including the identity of the offeror and the relevant terms. The Exclusivity Period shall automatically extend for successive 15-day periods unless the Company and Seller, on the one hand, or Buyer, on the other hand, provides the other party, at least two days prior to such automatic renewal, written notice that the Exclusivity Period shall not renew.

6.     Confidentiality.   Buyer and its respective affiliates and advisors, Seller, the Company, and the Company's affiliates and advisors shall keep all information regarding the Transaction (including the terms and existence of this Letter of Intent) in strictest confidence and not disclose such information to any third party, except to their respective representatives, agents, financing sources and advisors who need to know such information to solely to assist in the review and completion of the Transaction, and in such event, the disclosing Party shall  require any such parties to maintain in strict confidence any such information.

7.     Good Faith; Binding/Non-Binding provisions.   Each party agrees to negotiate the terms and conditions of the Purchase Agreement in good faith, it being understood and agreed that (i) this Letter of Intent does not purport to set forth all of the terms and conditions of the Transaction, (ii) with respect to those terms and conditions of the Transaction addressed in this Letter of Intent, this Letter of Intent does not purport to set forth all matters with respect to such terms and conditions, and (iii) the terms and conditions of the Transaction set forth in this Letter of Intent may change as a result of, among other things, Buyer's due diligence review. Notwithstanding the foregoing, the parties acknowledge that Sections 2, 3, 4, 5, 6, 7, 9 and 10 of this Letter of Intent are intended to be and shall be legally binding on each of the parties, but that the other provisions of this Letter of Intent are not intended to be and shall not be legally binding.

8.     Mutual Cooperation.   The parties shall cooperate in their efforts to cause the Transaction to be consummated, and in making or assisting in preparing or furnishing all information needed for such regulatory filings as may, in the opinion of counsel for Buyer, be necessary or advisable to complete the Transaction.

9.     Governing Law; Attorney's Fees.   This Letter of Intent shall be governed by the laws of the State of Delaware without giving effect to principles of conflict or choice of laws, and the parties agree to the jurisdiction of the federal and state courts of such jurisdiction for any legal proceedings resulting or relating to the terms hereof. In the event of any litigation arising from, or relating to a breach of any provision hereof, or any other matter pertaining to the matters or transactions contemplated herein, the prevailing party shall be entitled to award of its costs and expenses (including reasonable attorney's fees) incurred in any such matter.

10.     Entire Agreement; Counterparts; Amendment.   This Letter of Intent supersedes all prior understandings among the parties hereto. This Letter of Intent may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same Letter of Intent. Delivery of an executed counterpart signature page to this Letter of Intent by facsimile or e-mail shall be effective as delivery of a manually executed counterpart to

79514736.11

Case 3:23-cv-00803-ZNQ-JBD  Document 35-1  Filed 08/04/23  Page 93 of 115 PageID: 451

**RETRO CAPITAL GROUP, LLC**

this Letter of Intent.  Only a writing executed by each of the parties may amend this Letter of Intent.

\*        \*        \*

79514736.11

FILED: NEW YORK COUNTY CLERK 12/17/2021 06:26 PM    INDEX NO. 656511/2021

NYSCEF DOC. NO. 51    Case 1:23-cv-00803-ZNQ-JBD    Document 35-1    Filed 08/04/23    Page 94 of 115 PageID: 452    RECEIVED NYSCEF: 12/17/2021

## RETRO CAPITAL GROUP, LLC

If the foregoing constitutes a mutually satisfactory basis for proceeding and reflects our mutual agreements, please so indicate by signing and dating this Letter of Intent in the places indicated below and returning one fully executed copy to the undersigned.

Very truly yours,

**Retro Capital Group, LLC**

By:

Name: David Dwek
Title: Partner

Agreed to and accepted as of ___October 6___ , 2021

**Resurgence Behavioral Health, LLC**

By: _____

Name:   Stephen Fennelly
Title:  Owner & Chief Executive Officer

**Steven Fennelley**

_____

**RETRO CAPITAL GROUP, LLC**

## Exhibit A

### TERM SHEET
### FOR PROPOSED ACQUISITION OF
### RESURGENCE BEHAVIORAL HEALTH, LLC AND AFFILIATES

**Form of Transaction**   Subject to completion of Buyer's legal due diligence, the Transaction will be structured as the purchase by Buyer of the Company's ownership interests and/or substantially all of the assets owned and/or used by the Company and its affiliates in the Resurgence Behavioral Health substance abuse treatment business, including with respect to operations in California, Tennessee and Texas. The transaction structure and terms will be consistent with the provisions of this Term Sheet and shall be at Buyer's discretion. Excluded from the Transaction would be (i) accounts receivable for services rendered by the Company prior to Closing, and (ii) other assets expressly excluded by Buyer. The affiliate-owned real estate assets would be subject to purchase and/or lease on terms that the parties will address as part of due diligence.

**Purchase Price**   The enterprise value of the Company for purposes of the Transaction is **$22.3 million** as adjusted per the terms hereof, and further assumes a cash free/debt-free balance sheet, subject to due diligence (the "Purchase Price").

The Purchase Price will be paid in cash and shall be reduced by (i) all accrued but unpaid bonuses, PTO and severance or other obligations accrued or owing but unpaid as of the Closing that is payable to Company employees or affiliates, and (ii) all existing indebtedness and similar liabilities. The Purchase Price will be paid by Buyer as follows: (i) $1,000,000 to Seller at Closing, (ii) payment of the MCA or other debt to creditors thereof on terms satisfactory to Buyer at Closing, (iii) an additional $1,000,000 to Seller at the three-month anniversary of Closing, and (iv) the remaining net balance of the Purchase Price in six equal installments over the 7th-12th month anniversaries of Closing, subject to adjustment as reflected herein and Company and Seller compliance with the terms of the Purchase Agreement and all other transaction documents.

**Closing**   The parties shall use their best efforts to execute the Purchase Agreement and reach Closing by November 1, or as soon as possible. Closing would be subject to completion of Buyer's due

## RETRO CAPITAL GROUP, LLC

diligence, receipt of any material approvals and other closing conditions that will be detailed in the Purchase Agreement.

**Closing Conditions; Deliveries**

Closing will be contingent upon the satisfaction of customary conditions/deliverables, including, without limitation: (i) Buyer's reasonable satisfaction that the material licenses and payor relationships will remain intact (including via a management agreement), (ii) execution by Seller of a one-year services agreement to provide services to Buyer at a fair market value compensation level that will be agreeable to Buyer, (iii) execution by Seller of a non-competition/non-solicitation agreement during and for a period of one year from when Seller ceases providing services to Buyer, provided (x) Seller will continue to be allowed to operate the treatment program in Dallas Texas as presently operated, or contemplated to be operated, as well as any program in a state other than California, Texas or Tennessee, during this period and (y) Seller will have the right to operate the Option Programs as presently operated following any termination of the transaction with respect to such programs, as well as any other Programs in Texas or Tennessee that are reasonably approved by Buyer, (iv) execution at signing of employment agreements by one or more key employees to be identified by Buyer during its due diligence (to take effect at Closing), (v) absence of any material adverse change in the business, and (vi) material accuracy of all representations and warranties and other Seller-provided information relating to the Company.

**Additional Purchase Agreement Matters**

The Purchase Agreement will provide that Buyer shall have the option, at any time before the six month anniversary of Closing, to terminate the transaction with respect to the Company's operations in Tennessee and Texas ("Option Programs") in exchange for a reduction in the Purchase Price of $7,800,000. Buyer may elect such termination at any time on written notice to Seller, and shall further be entitled to a deduction in the Purchase Price to account for any operating losses it has incurred from its period of ownership of the Option Programs. Prior to the effective date of any termination of the transaction as to the Option Programs, Buyer shall have the sole right and authority to operate and manage (including via third-party management company of its choosing) the Option Programs. For the elimination of doubt, Buyer will have sole right to all revenue and accounts receivable from the Option Programs for dates of service prior to the effective date of any termination, but after the Closing Date of this Transaction, and

**RETRO CAPITAL GROUP, LLC**

shall convey the Option Programs back to Seller on an as-is, where-is basis.

| | |
|---|---|
| **Indemnification Matters; Representations** | The Purchase Agreement shall contain representations, warranties and covenants by the Company and Seller as are customarily present in transactions of this type. Customary fundamental matters such as capitalization, organization, transaction authority, enforceability, brokers, tax issues, as well as regulatory and healthcare compliance and compliance with laws, will survive until the expiration of the applicable statutes of limitations, with other representations and warranties surviving until the third anniversary of Closing. Buyer shall be fully indemnified for any pre-closing liabilities, including any and all pre-Closing claims, litigation or regulatory matters, payor audits or recoupment claims, governmental investigation(s) and any and all matters relating to the Company's pre-closing operations, or the operations of the Option Programs prior to transfer of the Option Programs to Seller, with offset rights and an appropriate escrow for such established based on results of Buyer's due diligence. |
| **Miscellaneous** | The Company shall obtain a tail insurance policy satisfactory to Buyer for any coverages that are presently written on a "claims made" basis at or prior to the Closing, with the cost of such policy borne by Seller, as reasonably requested by Buyer.<br><br>Buyer, on the one hand, and Seller as provided above, on the other hand, will each be responsible for their own legal and other professional fees incurred in connection with the Transaction. |

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

EMPIREMEDIHOLDINGS, LLC

        Plaintiff,

    v.

BRIDGE FUNDING CAP, LLC et al.,

        Defendants.

Index Number: 656511/2021

**AFFIDAVIT**

---

COMMONWEALTH OF PUERTO RICO  )

                         ) ss.

MUNICIPALITY OF DORADO       )

        Stephen J. Fennelly, being duly sworn, deposes and says the following under the penalty of perjury pursuant to CPLR § 2016:

1. I am over the age of 18 and reside in the State of California. My business address is 3151 Airway Avenue, Suite M1, Costa Mesa, California 92626.

2. I am the former owner of Resurgence Behavioral Health LLC ("RBH"), Resurgence California LLC d/b/a Resurgence California ("RC"); A New Start Treatment & Recovery, LLC d/b/a Muse ("Muse"); Balboa Horizons Recovery Services Inc. ("Balboa"); Coastal Recovery, Inc. ("Coastal Recovery"); Coastal Recovery Health & Wellness, Inc. ("Coastal Health"); Commissions Early, LLC ("Commissions Early"); and Pearl of the Sea Retreat, LLC's ("Pearl" and, collectively with RBH, RC, Muse, Balboa, Costal Recovery, Costal Health, and Commissions Early, the "Merchants").

3. BMF's counsel, Steven Wells, prepared an affidavit for me to execute.

4. I signed the document and sent it back to Steve Wells and with the express understanding and agreement that it would not be filed without my authorization. I believed I would still have an opportunity to review and revise the statements contained in the affidavit.

5. It was communicated to me that my cooperation with BMF would lead to a release of claims against me.

6. Ashlee Colonna Cohen has been my attorney at all times since November 3, 2021, and she continues to represent me in BMF v. Resurgence (531515/2021) , Merchant Capital vs. Resurgence (130964-2021), and this action even though I am not a party.

7. I have never had any other attorneys representing me in these matters.

Dated: September 22 2022

Stephen J. Fennelly

AFF# 4236

Notary:
Sworn an subscribe before me Pedro E. Vazquez Melendez by Stephen J. Fennelly of legal age, single, business person and Resident of Dorado, Puerto Rico. In San Dorado, Puerto Rico today September, 22nd, 2022. I have identified sign by the means of drivers license.





2 of 4

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 101 of 115 PageID: 459

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

EMPIREMEDIHOLDINGS, LLC,

               Plaintiff,

    v.

BRIDGE FUNDING CAP, LLC et al.,

            Defendants.

Index Number: 656511/2021

**CERTIFICATE OF
CONFORMITY**

ASHLEE COLONNA COHEN, an attorney duly admitted to practice law in the state of New

York states under the penalties of perjury:

1. I am the Principal of Colonna Cohen Law, PLLC and the attorney for Plaintiff.

2. I am an attorney admitted to practice in New York, thus qualified to make this
   affirmation of conformity.

3. Pedro E. Vazquez Melendez a licensed Attorney and Notary in compliance with the laws
   of the Territory of Puerto Rico.

4. Pedro E. Vazquez Melendez is qualified to notarize the accompanying affidavit.

5. Pedro E. Vazquez Melendez witnessed, in person, Affiant Stephen J. Fennelly execute
   the accompanying affidavit in the Territory of Puerto Rico on September 22, 2022.

6. The acknowledgement was taken following the laws of the Territory of Puerto Rico and
   the notary also conformed to the laws of New York State.

7. The First Department in *Matapos Technology Ltd. v. Compania Andina de Comercio
   Ltda,* 68 A.D.3d 672, 891 N.Y.S.2d 394 (1st Dep't 2009), ruled that the absence of a
   proper CPLR § 2309(c) certificate is "not a fatal defect," but observed that "the
   oathgiver's authority can be secured later, and given *nunc pro tunc* effect if necessary."

Case 3:23-cv-00803-ZNQ-JBD   Document 35-1   Filed 08/04/23   Page 102 of 115 PageID: 460

See *also Indemnity Ins. Corp., Risk Retention Group v. A 1 Entertainment LLC,* 107 A.D.3d 562, 967 N.Y.S.2d 364 (1st Dep't 2013) (in reversing supreme court and granting plaintiff's motion for a default judgment, court noted that "it is undisputed that following the denial of its motion, plaintiff submitted to the motion court a certification from the Maryland Secretary of State verifying and authenticating the qualification of the Maryland notary public who notarized the affidavit"); *Hall v. Elrac, Inc*., 79 A.D.3d 427, 913 N.Y.S.2d 37 (1st Dep't 2010) ("as long as the oath is duly given, authentication of the oathgiver's authority can be secured later, and given nunc pro tunc effect if necessary").

Dated: Brooklyn New York
         October 24, 2022

                                        /s/Ashlee Colonna Cohen
                                        Ashlee Colonna Cohen, Esq.

# EXHIBIT E



**Vanan Online Services, Inc.**
Think Service Think Vanan

## <u>Certificate of Transcription</u>

**Transcription of Telephone conversation. File Name: 1_6eIEIRKvogg.opus**

We, Vanan Online Services, Inc. a professional transcription company, hereby certify that the above-mentioned document(s) has/have been transcribed by our qualified and experienced transcriber(s) is/are accurate and true transcription of the original document(s)

This is to certify the correctness of the Transcription only. We cannot guarantee the veracity of the original File. Our Transcriber is in no way related, by immediate family ties or marriage, to any parties related to the materials Transcribed.

A copy of the transcription is attached to this certification.

**Crystal Nichols, Production Manager.**

Dated: 15th day of June 2023

Vanan Online Services, Inc.
ATA Member #266532
ISO 9001:2015

10711 Spotsylvania Ave., Suite A Fredericksburg VA 22408
Office: (888) 535-5668
Email: support@vananservices.com
Website: www.vananservices.com

# 1_6eIEIRKvogg

1    [audio starts 00:00:00]

2    Aron Hacoen:  … not his principal, it was someone else's principal, and the lawyer simply

3    messed up?   And again, but if his principal is 135, no one here if he can show that his principal is

4    135, 35, or …

5    Yonosson Schlesinger:  But, but again, he's not in business not to make money?    You

6    understand that, right?  We all want to make money.

7    Aron Hacoen:  Totally understand.

8    Yonosson Schlesinger:  So, his principal, he didn't just put out that money for fun, you know.

9    Aron Hacoen:  Well, we, well we appreciate that.

10   Yonosson Schlesinger:  So, you know he he's not, but I'm telling you as as just on the side?

11   He'll help your your big problem is not him, your big problem is the $5,000,000 guy, right?

12   Aron Hacoen:  Correct?

13   Yonosson Schlesinger:  Okay, so that's your big problem if you can show the judge that, look,

14   I settled with everyone, and that $5,000,000 guy is already up 7,000,000.

15   Aron Hacoen:  You made the tournament and we [indistinct 00:00:44] my understanding is

16   they offered him $3,000,000.

17   Yonosson Schlesinger:  I know, I know and he said no, right?

18   Aron Hacoen:  Right.

19   Yonosson Schlesinger:  But that's that's your problem guy.   That's not he's not your problem

20   guy?  If you want, he told me he can tell you you can settle with him for principle like on email

21   okay, the settlement?   So, you can show the judge whatever you need to show and pay him on the

22   side?   Whatever, whatever you guys agree.

1

# 1_6eIEIRKvogg

1    Aron Hacoen:  I don't think it's it's judge or not judge like we we're not like this is not our debt

2    right this is resurgence debt.  We're we're buying the facility free and clear.   Like part of the money

3    that we're paying is going towards the debt to pay back all the MCAs.   I'll give you a little a little

4    more background, like this is not us, this is someone else's debt.   The way we're going about it is

5    we made a deal with him that we'll negotiate on his behalf for his MCAs and you know he gets

6    the first 30% uhm of you know, the the negotiation that and we get everything after that, it's

7    lowering our purchase price.  Right, the sale - like, yes, we're never gonna be in a situation where

8    we have a problem.   We us in us.  We might not get the deal and lose money because we didn't,

9    you know, buy we didn't buy the facility but on the day of closing, everything needs to be settled?

10   Otherwise, we're not buying it.

11   Yonosson Schlesinger:  Correct, so it's not gonna go, it's not gonna go bankrupt?   You wanna

12   buy it because once it goes bankrupt, not you're buying it and then everyone is going to crap.

13   Aron Hacoen:  100% but right now, no one can do anything besides the us because we own

14   the two senior debts.

15   Yonosson Schlesinger:  Correct, okay.

16   Aron Hacoen:  Yeah, there's no problem?   Does say, there's no there's no problem.

17   Yonosson Schlesinger:  I know, but he's not gonna settle.   Let me just tell you, my friend is

18   not gonna settle for principle, he's just not, he said I'll rather fight and so so he's not gonna settle

19   for principle.   So, let's - how can we work out a settlement?

20   Aron Hacoen:  I mean let me let me talk to them again.   Like I said I'm not dealing with this

21   at all, I'm, - you're telling me he's not gonna settle so let, but then I can have them call you if you

22   want to be the one?

23   Yonosson Schlesinger:   No, I don't want to be the middle of it, can I, can I give?

2

## 1_6eIEIRKvogg

1      Aron Hacoen:  Who wants to be in the middle?

2      Yonosson Schlesinger:   No, I don't want to be the middle.?   I think you and and this guy

3      Krone, he's he's again, I only got involved because I'm helping out the yeshiva.   I'm not even I'm

4      a working guy, I just the Laser just let me into this and I just said let me help out?   So, he told me

5      he has a problem he gave a lot of money for BMG and we're trying we're all here trying to help it

6      out.   He needs to make money because now nobody's giving a guy a loan for free and I'll take

7      back your principle loan, shut up.   It just doesn't work like that.

8      Aron Hacoen:  No, I I I totally understand but I think I think they're negotiating tactic is like

9      the the other option you this this company going bankrupt and you waiting 18 months to maybe

10      get $0.60 on your dollar, I think.

11      Yonosson Schlesinger:   No, I understand, I understand but again, there, there I I totally get

12      you, but you have to understand their position, right?  [indistinct 00:03:34]

13      Aron Hacoen:  And and so I'm gonna ask you one question if this is just a negotiation, like

14      why don't why don't he keep on like he's not gonna settle, let him tell that to the lawyer, you know,

15      like why, why we, why are you and me involved?

16      Yonosson Schlesinger:   Again, because it's too even that want to try to help and it's it.

17      Aron Hacoen:  [indistinct 00:03:50]

18      Yonosson Schlesinger:   It can- we don't have to go and fight you know we can they can settle

19      this, he's a levelheaded guy he you know giving back principles not where any, it's just that's law

20      taking advantage let's come up with something that's fair?   You know you wanna nail it down,

21      you pay 49%, you wanna nail it down to something less, let's let's do what's fair.

22      Aron Hacoen:  I mean in in in a certain sense, if we're not coming in and buying this facility

23      he's not getting his principal back fact?   Those are facts, he is the last online with on the

# 1_6eIEIRKvogg

1   $10,000,000 you know debt that that is not gonna get paid by the, by the you know by the assets

2   of the company because there are no assets the only assets are AR?

3      Yonosson Schlesinger:   Correct.

4      Aron Hacoen:  And so, so in a certain sense, him being like, again, I'm, I'm, and I'm actually

5   like I'm thinking about this now like he's being an idiot, not to sell, right?  If he's gonna fight this

6   till the end, then he's gonna end up not, like if this deal doesn't go through, he's not gonna get his

7   money.

8      Yonosson Schlesinger:   I know, so make it - I understand?   So, if you want to save money,

9   which I totally understand, and you want to buy this facility, right? This facility I guess has has

10   big AR's.

11      Aron Hacoen:  Potential.

12      Yonosson Schlesinger:   Potential gonna be a good deal?   So, you want to try to get as many

13   people out of the way, but make it sweet, giving back principles, not making it sweet?   I know

14   you're saying, listen, if they go bankrupt, they lose everything.   But still nobody's going bankrupt

15   with with such AR's or maybe they do, but but still, it's a good business.

16      Aron Hacoen:   100% deal next week period.   Like there's not even a [indistinct 00:05:14]

17   There is no w-, they have $6,000,000 in AR, $10,000,000 in in in ..

18      Yonosson Schlesinger:   In debt.

19      Aron Hacoen:  … debt?   Right?   And and and payroll that they can't make came out can't

20   make every week so they are 100%, this is the third time he will be filing for bankruptcy if we

21   don't buy this facility.  Like those are facts not not questionable.  So, I understand that you know

22   we're trying to make the the guy a sweet deal but you and him need to understand that it is a sweet

23   deal that he's getting this principle back?   I mean, now again I'm just like I said I haven't been

# 1_6eIEIRKvogg

1  done doing any of these negotiations I don't I didn't hear about this guy's name or how much he's

2  owed or what is owed till this morning from JoJo, you know?   But I'm just like I'm, I'm telling

3  you as yes, and [indistinct 00:05:57] that you you're missing part of the fact that it is a sweet deal

4  in a certain sense, right.

5  Yonosson Schlesinger:   How did you find this attorney?

6  Aron Hacoen:  I have no idea.

7  Yonosson Schlesinger:   Then who found …

8  Aron Hacoen:  It's not ours, that's why I'm saying, [indistinct 00:06:12]   I I listen they there

9  was a specific need that one of the one of the five partners have to have you know their name

10  someone had to own this LLC they put my name on it, I was okay with it to own the senior debt

11  and and I am not involved at all.  Like I I I like I said I didn't know if there was more I know like

12  I got a list at some point but you know how much is owed but I have no idea who's who you know

13  who is owned what.

14  Yonosson Schlesinger:   Mm-hmm, I see.

15  Aron Hacoen:  And I, like I said, I have no problem calling the guy and telling the guy was

16  doing the negotiation on the phone?   Guy who's dealing with an attorney and saying listen, there's

17  like there's another he and you know maybe you want to talk to the guy directly like.   But at the

18  end of the like we can find out about it and and discuss it and try to help as much as we can like

19  our knowledge of the deal, A, is mine is yours is way more limited than mine and mine is still too

20  limited in the MCA world to understand like whether the guy is being screwed or the guy is actually

21  being, getting, giving, giving a good.

22  Yonosson Schlesinger:   Think the 57 and the 57K is not gonna make him walk away?   I'll

23  rather just sit and fight.   He's not gonna settle for 57,000, I can just tell you that, you know?

5

## 1_6eIEIRKvogg

1    Aron Hacoen:  [indistinct 00:07:22] I'm not sure what he can do, that's my only?   Okay, hey,

2    I don't know.    Again, like I said, I don't know,  I don't know how these things work.    I I don't

3    know, I don't know what the boy is telling him the other option is, right?

4    Yonosson Schlesinger:   I don't know?

5    Aron Hacoen:  Maybe?

6    Yonosson Schlesinger:   Maybe give him a sweep back, give him back the principal and give

7    him something on the side, you know, that's what he's looking for.

8    Male Speaker:  What is he looking for? How much Like what?

9    Yonosson Schlesinger:   This is what they do?   This is what they do?   The - listen …

10   Aron Hacoen:  The guy $10,000,000 I'm this is not a Guzman by the way?   It's $10,000,000.

11   About what what they're telling him, what the lawyers telling, but the other child is?   I could talk

12   them from the name of tomorrow and explain to him what I just explained to you?   But I might

13   me, I might be missing facts, right?

14   Yonosson Schlesinger:   Mm-hmm, okay, I know he's he's looking more for like if you want

15   to do, if you want to show something that you guys settled with him like for principal, he wants to

16   get the full principal and another like on the side probably 150, $200,000.

17   Aron Hacoen:  He wants to double his money?

18   Yonosson Schlesinger:    Yeah, he wants, he wants to get paid back with a contract, says

19   Because he's …

20   Aron Hacoen:  [indistinct 00:08:33] the option is and obviously, obviously they have some

21   like the, you know, the lawyer and and my partners obviously have some leverage over him or any

22   and everyone else that is settling?   Uhm and like at the end of the day, like probably again the fact

23   that he's a Jew is very nice, that's why they're willing to give him back his principle and not make

6

# 1_6eIEIRKvogg

1  him lose money?  Uhm but at the end of the day, I just, I I don't know like I don't like.  Yes, he

2  went into the deal, but that unfortunately did not [indistinct 00:09:02] I have if we have the leverage

3  and the other option is he gets nothing then but like I said I don't know if that's …

4  Yonosson Schlesinger:  Listen, but, between you and me, I don't think you can buy this with

5  he still has the UCC filing?  You still have, if you don't settle with everybody, you know you're

6  not buying it and it goes bust, right? You're not going to buy it if you know?

7  Aron Hacoen:  But again…

8  Yonosson Schlesinger:  … know that he's.

9  Aron Hacoen:  But again 57, again 57 is the assumption that that's the principle no?  Not the

10  …

11  Yonosson Schlesinger:  You're saying - yeah, but he's going to want to make something

12  above that.

13  Aron Hacoen:  No, I understand, you're you're saying [indistinct 00:09:37] like let's be like

14  let's just get the numbers [indistinct 00:09:40] principal is a given, after that he wants to make

15  money and now let them negotiate how much that money.

16  Yonosson Schlesinger:  How much money is yeah, I got.

17  Aron Hacoen:  I mean, I'm not, I'm like, that's what I'm saying?  I'm not sure where we and

18  you are going to be helpful.

19  Yonosson Schlesinger:  I don't know.

20  Aron Hacoen:  He wants to … but.

21  Yonosson Schlesinger:  He came to me saying, you know this guy, I'm don't know Coren?  I

22  speak to [indistinct 00:09:57] I know very well?  Okay, then he brought JoJo on the line and and

23  this is …

7

# 1_6eIEIRKvogg

1   Aron Hacoen:  And here we are.

2   Yonosson Schlesinger:   And here we are, exactly.

3   Aron Hacoen:  Their side about what is principle.

4   Yonosson Schlesinger:   But then I have to do anything with us?   They're jumping from 157

5   …

6   Aron Hacoen:  No, no, no, taxes.  No taxes, no taxes, no taxes, no taxes.  Uhm, that the way

7   again, my understand, I gotta take, I'll tell you, after JoJo called me, I got a text?  Hold on?   Where

8   is it.

9   Male speaker:  Before you called him?

10  Aron Hacoen:  Oh, before I called him.   No, I got the text after you called him.

11  Male Speaker:  I called you.

12  Aron Hacoen:  After you called me without Commission Merchant Capital is owed 57 and we

13  had the wrong numbers and offered 135.  They had the wrong number.   Again, I don't know what

14  that means, like I said.

15  Yonosson Schlesinger:   It had nothing to do with you.

16  Aron Hacoen:  It didn't sound like it.

17  Yonosson Schlesinger:   Mm-hmm, it basically here advanced them, you know?

18  Aron Hacoen:  Right, you just told me now that his total what he was supposed to make was

19  $200,000?   And when we asked you, you know, I asked you a couple minutes ago what you think

20  you would be happy with and your answer was 200 grand?   Basically, he wants his full money.

21  He wants to walk away.   He's he did the best deal on his own.

22  Yonosson Schlesinger:   He wants to walk away making money?   Yeah, he doesn't wanna.

23  Aron Hacoen:  Again, he's making money and …

# 1_6eIEIRKvogg

1    Yonosson Schlesinger:  I understand.  So, if he says 200, you tell me 100?  Okay, so we're

2   negotiating, but you tell me nothing.  So, you know, I mean.

3    Aron Hacoen:  If he's starting offer is, I don't want to lose anything?  Then it's not,  you're

4   not negotiating.

5    Yonosson Schlesinger:  Understand, understand.  So, you tell me what you want to want me

6   to go back to him?

7    Aron Hacoen:  So, I said this, I don't want, I don't want you to go back to him with anything

8   until I talk to my guys and that's …

9   Male Speaker:  Hello, yeah

10   Yonosson Schlesinger:  Yeah.

11   Male Speaker:  Us them saying that they're going to pay back the full principle is is, is the

12   offer?  Now he has to come back and say something that's $700,000?  That's not make any sense.

13    Yonosson Schlesinger:  My goodness and I understand you,  I just, I just, I'm telling you what

14   he wants to do?  This is what he wants, right? You tell me what you want, and then we just meet

15   in the middle.

16    Aron Hacoen:  Okay …

17   Male Speaker:  I recall them.

18    Aron Hacoen:  Yeah, I'll call them?  What's the guy's name? Just like I get the facts right?

19    Yonosson Schlesinger:  Krone.

20    Aron Hacoen:  Krone and it's not like who's it's it, cause they thought, they thought it was a

21   guy Wolf and a different guy?  Like with the different guy, like, me like I had a feeling the wires

22   are being crossed big time.

23    Yonosson Schlesinger:  I don't know someone Wolf.

# 1_6eIEIRKvogg

1    Aron Hacoen:  Is there a Wolf involved also?

2    Yonosson Schlesinger:   I don't know?   Maybe?

3    Aron Hacoen:  What's the guy's [indistinct 00:12:20]

4    Yonosson Schlesinger:   What?

5    Aron Hacoen:  What's Krone's first name?

6    Yonosson Schlesinger:   Yasi.

7    Aron Hacoen:  Yasi Krone, K R O N E, Krone.

8    Yonosson Schlesinger:   Yeah.

9    Aron Hacoen:  Okay.

10   Yonosson Schlesinger:   Maybe, maybe it's with Wolf?  I don't know.   I don't know.   I just

11   don't?   I only know him.

12   Male Speaker:  Want to find out?

13   Yonosson Schlesinger:   I can find that doesn't matter.

14   Male Speaker:  No, no.

15   Aron Hacoen:  I just want to in this industry again, not that it matters, but like the guys that

16   are that are doing this, uhm the guys that are negotiating, like obviously they're negotiating with

17   some a coming out of with a position of some type of strength?   So, I'm gonna first have to find

18   out what they have over him and like why look look if again, like you said if the other option is is

19   is bankruptcy and you know Krone Wolf, don't believe that you're gonna let it go to bankruptcy?

20   Let him, you know let him keep his position?   If they have something else that they they know

21   about and and they feel that this is the best offer that he's not getting out?   He should be happy

22   he's getting his principal back, then there's not gonna be much I can tell you.   Like I can try to put

23   you from public, I don't think it's gonna work if if there is obviously, you know, if him sticking

# 1_6eIEIRKvogg

1  his, you know, heels in the sand is not gonna get him anywhere, then you know I can try but I don't

2  think I'll get any?   I will get any.

3      Yonosson Schlesinger:  Mm-hmm.  Okay, listen, like I said, I don't know how much that's

4  here?  I'm just trying to help out two people.   I can, if I can help out, if you don't want to pay the

5  full price, but you want to settle on some just let's let's just say something?   You hear me?

6      Aron Hacoen:  Yeah, let …